499 So.2d 436 (1986)
W.J. WEGMAN, Jr., et al., Plaintiff-Appellee,
v.
CENTRAL TRANSMISSION, INC., Defendant-Appellant.
No. 18086-CA.
Court of Appeal of Louisiana, Second Circuit.
December 3, 1986.
Rehearing Denied January 15, 1987.
Writ Denied March 20, 1987.
*439 Hudson, Potts & Bernstein by James A. Rountree, Monroe, for defendant-appellant.
William A. Hargiss, Monroe, for plaintiffappellee.
Before JASPER E. JONES, NORRIS and LINDSAY, JJ.
LINDSAY, Judge.
The defendant appeals a judgment based upon a jury verdict which cast Central Transmission, Inc. (CTI) for damages consisting of unpaid gas royalties, penalties and attorney's fees pursuant to LSA-R.S. 31:140 et seq., for payment of the purchase price for gas under a gas purchase contract, and which cancelled six oil, gas and mineral leases held by other defendants referred to in the record as "limited partnerships."
Suit was filed on January 29, 1982, by Joe Wegman, Jr. (Wegman), Joe Wegman, Jr. Ltd. (Wegman Ltd.), and Bobby Joe Hodge (Hodge) against Central Transmission, Inc. (CTI), Central Transmission, Inc. Associates 1974-1 Ltd. (1974-1 Ltd.), Central Transmission, Inc. 1975-2 Ltd. (1975-2 Ltd.) and Central Transmission, Inc. Associates 1975-4 Ltd. (1975-4 Ltd.) (collectively "Limited Partnerships"). Plaintiffs sought to recover amounts due as payment for royalties on mineral leases and for the amounts due from a gas purchase contract, alleging that defendants' had failed to properly measure the gas produced, to apply the correct price to the gas produced and to properly maintain and drill gas wells so as to prevent drainage and loss of production. After a jury trial, the jury returned a verdict in favor of plaintiffs and against CTI finding that CTI failed to credit plaintiffs with the correct quantity of gas produced and failed to pay the proper price. The remaining claims against CTI and all claims against the remaining defendants were dismissed. The jury awarded plaintiffs a total of $225,929.73 and dissolution and cancellation of the leases between plaintiffs and CTI.
On November 29, 1984, defendants filed a motion for judgment notwithstanding the verdict. Pursuant to that motion, the trial court reduced the total of the award to $135,508.83 due to miscalculations by the jury. Although the total award decreased, certain portions of the award were increased. The defendant appealed. Having found merit in some of the issues raised by defendant, we amend the judgment of the trial court by reducing the total of the award to $132,391.31.
Briefly stated, and as an overview of this litigation, the record revealed that plaintiffs are the lessors under oil, gas and mineral leases and a grantor in a gas sales contract, all in favor of the defendant, CTI. The leases, as well as the gas purchase contract obtained from Wegman and Wegman Ltd., were modified by supplemental contracts.
CTI assigned the gas leases to various limited partnerships which it created. CTI retained the gas purchase contract. CTI purchased gas from the limited partnerships and others and transported the gas to IMC Pipeline Co., Inc., (IMC), to whom it was sold for a substantial profit. Under the gas purchase contract, CTI was operating in a similar manner by purchasing gas at a low price from the plaintiffs and selling it at a substantial profit, contrary to certain agreements which it entered into with the plaintiff. The primary issues in this case are the amount CTI was paying plaintiffs under the contracts at issue and whether CTI was paying plaintiffs for the quantity of gas actually produced.
The jury found that CTI was in bad faith in its dealings with the plaintiffs and was not paying the proper price or paying for the proper quantity of gas and awarded damages accordingly. The jury also awarded penalties and attorney's fees under the provisions of LSA-R.S. 31:140 et seq. Thereafter, as previously mentioned, certain modifications were made of the jury verdict by the trial judge, which will be mentioned fully hereafter. From the jury *440 verdict and judgment of the court, CTI appealed.
For a proper understanding of the difficult and complicated issues presented in this litigation, and a determination of whether the jury verdict is supported by sufficient evidence, a detailed review of the various agreements entered into by the parties, the status of the parties themselves and the manner in which the business relationships were conducted is essential.

I. BACKGROUND FACTS

HODGE LEASE
This case involves three separate tracts of land, the first of which is governed by two separate transactions. On March 17, 1964, Hodge leased a tract of land[1] (Hodge Lease) to Wegman for a 1/8 royalty. Wegman assigned this tract to Wegman Ltd., reserving a royalty interest for himself. Wegman Ltd. then drilled the W/H No. 1 Well on the eastern half of the lease.

a) Gas Purchase Contract
In 1974, John Swank, vice president of CTI, proposed buying gas produced by W/H No. 1 from Wegman Ltd. Wegman offered CTI a package deal involving a gas purchase contract, a gas pipeline and two separate leases. On July 22, 1974, CTI contracted with Wegman Ltd. to buy gas produced by W/H No. 1 at the rate of fifty cents per mcf plus one-half of any price received by CTI over eighty-five cents per mcf. A supplemental contract contains a provision providing for renegotiation of the price if the city of Monroe did not purchase the gas provided by Wegman Ltd. In order for CTI to sell gas to the city of Monroe, it would be required to build the approximately twenty mile long pipeline to transport gas to the city of Monroe, at considerable cost. If CTI did not incur this cost, Wegman hoped to renegotiate and obtain a higher price for himself.

b) Wegman/Hodge Lease
On December 21, 1974, Wegman Ltd. assigned the western one-half of the Hodge lease (described above) to CTI and reserved an overriding royalty. Thus, the Hodge lease is effectively split in two; one half governed by a gas purchase contract and the other half by an assignment of the lease.

WEGMAN LEASE
On September 30, 1974, Wegman granted an oil, gas and mineral lease to CTI, reserving a one-fifth royalty and requiring that a well be drilled within sixty days.[2] CTI realized it could not drill the well within sixty days and convinced Wegman to enter into a new but nearly identical lease on November 19, 1974 covering the same tract of land.

B.J. HODGE LEASE
On July 10, 1975, Hodge granted an oil, gas and mineral lease to CTI,[3] reserving an overriding royalty of one-sixteenth. He also obtained an additional royalty amounting to the market value at the well of one-eighth of gas sold off the leased premises (for a total of three-sixteenths royalty).

SUPPLEMENTAL CONTRACTS
Thereafter, Wegman negotiated two undated supplemental contracts with John Swank, who represented CTI. The two supplemental contracts were unrecorded. *441 The first covered the lease made by Wegman to CTI (the Wegman lease) and the second covered the lease between Wegman Ltd. and CTI (the Wegman/Hodge lease). It is disputed whether the second supplemental contract was applicable to the gas purchase contract.
The supplemental contract provided royalties based on a gas price at the wellhead of not less than fifty cents per mcf, plus one-half of any price escalation obtained above eighty five cents per mcf which might be obtained from the city of Monroe, Louisiana, to whom lessee proposed to sell production. Should gas be sold to buyers other than the city of Monroe, lessor was to be provided a copy of the gas sale contract, and lessee and lessor were then to come to an equitable agreement for a new price base for computation of royalties. However, under no circumstances was the price to be less than fifty cents per mcf. For purposes of computing royalties, the basis of measurement of gas production was to be the individual well meter reading, with a maximum allowable deviation of three percent of production, where justified, to adjust to master meter differences.

CTI'S LIMITED PARTNERSHIPS
CTI also began to form limited partnerships, or partnerships in commendam, in order to raise capital for the drilling of wells and to allow stockholders of CTI and others to take advantage of certain tax benefits. Plaintiffs claim that the formation of the limited partnerships was also the first step in defrauding them.
Although more fully discussed hereafter, plaintiffs contend that by controlling these "limited partnerships" CTI was able to buy gas from the limited partnerships at a low price, and on the basis of this low price, plaintiffs' royalties were paid. Plaintiffs contend that CTI, having purchased the gas at a low price from its "alter ego" limited partnerships, then resold the gas at a high price to IMC, thereby realizing a large profit while plaintiffs received low royalties.
CTI controlled the limited partnerships. For example, the limited partnerships contracted to sell gas produced from the leases to CTI several days before the leases were actually obtained from CTI. Additionally, one limited partnership actually drilled a well on a lease belonging to another limited partnership. Over a week later, the drilling partnership obtained the lease.
All of the gas purchase contracts and lease assignments were signed by Robert Fain as the representative of CTI and of each limited partnership. Many witnesses testified that various contracts were not "arms-length agreements" because of the favorable terms received by CTI, one person having negotiated for both parties and the partnership's failure to renegotiate after the primary term had expired or to take advantage of certain contractual provisions.
This evidence forms the basis of the jury's conclusion that the limited partnerships were completely controlled by CTI and being used to the advantage of CTI.

CTI'S GAS MARKETING
On January 9, 1976, CTI began selling its gas to IMC Pipeline Co., Inc. (IMC) and its predecessor company. Therefore, CTI was not required to build a twenty mile pipeline that would have been required had the gas been sold to the city of Monroe. CTI did not inform Wegman, as required by contract, that the city of Monroe was not the ultimate purchaser of gas.
In order for CTI to sell the gas to IMC, CTI was required to transport the gas to IMC's pipeline. CTI had already purchased a gathering line from Wegman. This line was extended approximately one-third mile in order to reach IMC's line. The gathering line purchased from Wegman cost $9,000. To extend the line required an expenditure of $23,234, yielding a total price of $32,234.
W.B. "Bill" Moran was qualified as an expert in gas marketing and transportation. He testified that a charge of fifteen cents per mcf would pay off the pipeline, cover incidental costs and provide a profit.
*442 Therefore, where allowed, a transportation charge in excess of fifteen cents per mcf would not be reasonable.
CTI officials disagreed, contending that this pipeline should not be considered alone in determining cost. CTI owned several lines by the time suit was filed and the cost of each was considered by CTI to determine price.

DISCOVERY OF INCORRECT MEASUREMENT OF GAS PRODUCED
During the fall of 1980, Roy Nolan, an employee of CTI, told Hodge that Nolan's brother was receiving royalties on a dead well (Nolan B-1) that fed into the same pipeline as Hodge's wells. Gas from numerous wells was commingled in CTI's gathering line. Each well was paid a pro rata portion of the total delivered at the end of gathering line. Thus, Nolan's brother was being paid for gas which was not produced. Once informed of the dead well, Wegman began to investigate.
The lessee of this well was Equitable Petroleum Corporation (Equitable), CTI's agent. Equitable was under contract to CTI to manage CTI's field operations from 1977-1979. This duty included "well tending, meter reading and calibration and distribution of proceeds ..." Equitable continued to perform this duty as to its own wells after 1979.
Production credited to the dead well (Nolan B-1) affected the production figures of the other wells on the same line because of the method of determining production used by CTI. Under CTI's method, each well contained its own meter showing the number of mcf's produced by each well. At the end of the gathering line a master meter showed the total amount of gas delivered to that point. The difference between the figure shown by the master meter and the sum of the meters at each well determined "line loss." Line loss was then charged against each well on a prorata basis.
Contrary to this method of allocation, the supplemental contracts provided that payment would never amount to less than three percent below the reading of production on the well meter chart.
William Jon Yelton, Jr., an inspector with the Louisiana Office of Conservation, (which regulates the oil and gas industry in Louisiana) testified that the system of measurement and commingling used by CTI is not approved by departmental policies. Commingling is only authorized after a permit has been issued and certain requirements, found in Department of Conservation Order 29B and 29D, are met. Additionally, he testified that his office had not issued a permit to CTI. Yelton's opinion was confirmed by the testimony of Hugh McDonald, a consulting petroleum engineer. Additionally, Department of Conservation Order 29 is filed in the record.
The evidence showed that in addition to nonproducing wells registering production, many wells were registering production at an artificially high level. A high reading on other wells would cause the quantity reported by plaintiffs' wells to be disproportionately reduced.
According to Justin Turner, a consultant to CTI handling their field operations, the meters were calibrated and working properly. Mr. Turner worked with CTI for a short time during the spring of 1976 and then again beginning in May of 1981. Equitable performed this function from 1977 to 1979 and continued to perform this function on its own wells thereafter. According to Mr. Turner each meter was zeroed every month. The zeroing of a meter is the setting of the differential pin at the zero level of a chart when a new chart is placed in a meter. In addition to zeroing the meter, the meters were calibrated every six months.
The actual reading of the charts was done by Miro Measurement of Monroe, Louisiana. Mr. Turner felt that part of any line loss was due to high readings by Miro Measurement, not improper calibration.
To the contrary, the reading of the well meter charts by Miro Measurement Service was confirmed by Gardner Consultants, *443 which read the same charts. The two companies consistently came within one or two mcf's of each other on the separate charts.
In December of 1983, at plaintiff's request, John Yelton examined the meter charts on Equitable's wells known as the "Exxon EBJ's." From examining the charts, Mr. Yelton was of the opinion that the differential pin was set high so that it would not go to zero and the meter could not be properly read. Moreover, Hodge testified that he observed meters on Equitable wells that failed to zero when production ceased. The net result is that these wells showed production in excess of actual production, again causing the quantity produced by plaintiffs to be disproportionately reduced.
CTI computed its line loss on a monthly basis. Over a period of several years, there were times when CTI reduced the production reported by the well meters by over forty percent. The reduction was made so that the sum of all reporting wells would match the production shown by the master meter. For a substantial period of time, line loss ranged from fifteen to fortyfive percent. Several individuals testified that a normal amount of line loss would be two to five percent. Witnesses stated that anything over five percent would have caused them to search for problems in their line and have them corrected. However, CTI did not attempt to correct the problem until after suit was filed.
The jury determined that the quantity of gas for which payment was due should be based on the well meter charts minus three percent and that CTI concealed the amount of production from the plaintiffs. The testimony discussed above adequately supports the jury's conclusion that the plaintiffs were not being paid for the quantity of gas actually produced by their wells and that the defendant exceeded the contractually permissable deduction of three percent for line loss.

PRICE PAID BY CTI
Not only did plaintiffs present evidence on the problem of measurement, they also presented evidence that the price paid by CTI per mcf was too low because CTI created an artificial market value for gas. The framework of the "scheme," according to plaintiffs, was that CTI assigned the leases it obtained from the plaintiffs to the limited partnerships controlled by CTI. CTI then purchased the gas from the limited partnerships at a low price. CTI's purchase of gas from the partnerships at a low price established a low market or well head value. CTI then sold the gas to IMC at a much higher price. Since royalty payments were based on the market or well head value of the gas, royalty payments were reduced. By using this arrangement, CTI made large profits when the only value added to the product by CTI was transportation through a short gathering line. Often, based on comparisons of the price of gas sold by other area companies, CTI paid the limited partnerships and Wegman thirty to fifty percent less than market value. CTI claimed that the difference in price was due to its cost and transportation charges. However, experts who testified at trial described such "transportation charges" as "outrageous," "intolerable" and "a sham."

DEMAND FOR PAYMENT
After Wegman discovered several of the facts mentioned above, he contacted Robert Fain, president of CTI, and made several demands. In particular, a demand letter was sent on October 8, 1980 requesting a correction in payment because of the incorrect allocation of production.
In response to the demand letter, CTI made payments to Wegman on December 15, 1980 and January 18, 1981 in the amount of $3,000. Also, on February 13, 1981 a payment of $2,696.97 was sent. A payment of $981.83 was sent to Hodge. The cover letter for the last payment indicated that CTI sent the payment as "final payment" and requested that Wegman contact them if any other problems remained. Although Wegman made further attempts to resolve the problems, he was unsuccessful. In answer to jury interrogatories, the *444 jury stated that some claims were settled by the payment which was made in response to the demand letter but not all claims were settled due to CTI's failure to communicate with Wegman.
Wegman continued to make demands upon CTI and due to his failure to receive satisfaction, filed this suit in January of 1982.

II. DISCUSSION

B. OPINION
Defendant raises numerous issues concerning price, production and applicability of the supplemental contracts. We now consider these issues.

PRESCRIPTION
During the oral argument presented to this court, defense counsel filed an exception of prescription as to any claim for damages due to "misrepresentations" which sound in tort. "Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the date injury or damage is sustained." LSA-C.C. Art. 3492.
Defendant contends that this action has prescribed since suit was filed on January 29, 1982 and Wegman had clearly learned of any possible damages by October 8, 1980 when Wegman's demand letter was written. In that letter Wegman asked that payment be made for quantities of gas produced but not measured and for additional payment because an inadequate price had been paid on the gas which was sold by CTI to IMC.
Although defendant contends that plaintiff has alleged a cause of action in tort which has prescribed, we find that the claims made by the plaintiffs sound in contract and that the awards made by the jury to the plaintiffs are based upon defendant's failure to fulfill its contractual duties. However, we also note that even if this action was one in tort, the prescriptive period was interrupted by payments made by CTI in response to the demand letter.
The issue of misrepresentation concerns both price and quantity. The jury found that the defendants consciously misled the plaintiffs about the identity of the purchaser of the gas. The identity of the purchaser of gas had a direct bearing on the price to be paid. The jury also found that CTI sent statements to plaintiffs which incorrectly stated the price on which royalties should have been based and incorrectly set forth the amount of production from the wells.
Liberative prescription is a mode of barring an action as a result of inaction for a period of time. LSA-C.C. Art. 3447. Hence, "prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe." LSA-C.C. Art. 3464. Acknowledgment sufficient to interrupt prescription includes partial payment. Lake Providence Equipment Company v. Tallulah Prod. Cred. Assoc., 257 La. 104, 241 So.2d 506 (1970); Deville v. Louisiana Farm Bureau Insurance, 492 So.2d 895 (La.App. 3rd Cir.1986).
In response to Wegman's demand letter, which defendant asserts evidences plaintiffs knowledge of misrepresentations, CTI sent three payments to Wegman. These payments were made on December 15, 1980, January 9, 1981 and February 13, 1981 and totaled $8,696.97. Additionally, Hodge received $981.83. Hence, prescription was interrupted by these payments.
If prescription is interrupted, the time that has run is not counted. "Prescription commences to run anew from the last day of interruption." LSA-C.C. Art. 3466. The cover letter forwarded with the last payment made in compliance with the demand letter was dated February 13, 1981. Suit was filed on January 29, 1982. Less than one year had elapsed since the February payment. Therefore, any claim against defendants for misrepresentations has not prescribed.

REVIEW OF FACTS
Many of the following issues raised by CTI require this court to review the factual *445 determinations of the jury and of the trial judge in his denial of defendant's motion for judgment notwithstanding the verdict. Although appellate review extends to the facts of the case as well as the law, we will not disturb a finding of fact by the trial court unless it is clearly wrong. Arceneaux, v. Domingue, 365 So.2d 1330 (La. 1978); Copple v. Gonyea, 431 So.2d 869 (La.App. 2d Cir.1983). Similarly, since the trial judge has also reviewed the issues raised here in his judgment on the JNOV we must examine the record to determine whether the judge's conclusions were manifestly erroneous. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.1985).

APPLICATION OF SUPPLEMENTAL AGREEMENT
The defendant contends that the second of two supplemental agreements, and the price and measurement provisions contained therein, does not apply to the gas purchase contract (W/H No. 1) and that if it is applicable, then the trial court incorrectly applied it to determine an equitable price. Our review of the record reveals that the jury was not clearly wrong in its determination that the supplemental agreement applied to the gas purchase contract.

1. Alleged Confusing Jury Answer
Defendant insists that we can give no weight to an answer to an interrogatory presented to the jury because the answer is confusing. We do not find the answer so ambiguous that it is not entitled to weight.
The following interrogatory was presented to the jury: "Did the price and measurement provisions in the supplemental agreements apply to the Wegman 1 and 2, the BJ Hodge, and the Wegman-Hodge wells. If not all wells, which well did they apply to?" The answer given by the jury is "Wegman-Hodge wells." Defendant contends that this is a confusing and inconsistent answer and therefore it should not be given any weight by this court.
Defendant refers to Porter v. Utica Mutual Insurance Company, 357 So.2d 1234 (La.App. 2d Cir.1978). Therein, the court determined that it was unable to give the usual weight to the jury's findings. The court was therefore required to review the evidence in order to render a proper judgment in accordance with applicable law. In Porter, the inconsistencies arose from a comparison of answers to several questions.
In the instant case, the defendant contends that the answer is confusing and inconsistent because it refers to wells (plural) when there is only one Wegman-Hodge well. We do not find this answer to be inconsistent or confusing. Defendant points to no other finding of fact by the jury with which this answer is inconsistent. Additionally, the jury may have erroneously referred to wells, instead of well, because the question presented to them refers to "the Wegman-Hodge wells." In any event, the jury's answer clearly demonstrates that the supplement agreement applies to the Wegman-Hodge well.

2. Determination of Applicability
Defendant contends that there is insufficient evidence for the jury to determine that the supplemental agreement modifies the gas purchase contract. The two supplemental agreements are undated and unrecorded. Evidence presented at trial indicates that they were signed sometime between June 4, 1974 and July 26, 1974. On these dates, Wegman wrote letters to John Swank of CTI. The defendant refers to language in both letters which allegedly infer that the parties did not intend for the supplemental agreement to apply to W-H No. 1.
The June 4, 1974 letter is a cover letter sent with documents pertaining to the Wegman lease, the sale of the pipeline and a farm out agreement between Wegman Ltd. and CTI. Additionally, the supplemental agreement is included and is mentioned in the paragraph concerning the farm out agreement. According to the letter, the supplemental agreement is to control "the manner in which the well is to be drilled and completed." A postscript (PS) to the letter states "this covers all documentation *446 for what we have agreed to do with the exception of the sale of gas on the existing Hodge No. 1 gas well" (referred to herein as W-H No. 1).
Wegman testified that the letter must be understood in reference to various phone conversations between himself and Swank. The letter is not an indication that the supplemental agreement is not binding on the gas purchase agreement. It merely makes special reference to the provisions of the supplemental contract which are of importance to the lease assignment contained in letter.
The defendant also contends that the letter of July 26, 1974 infers that the supplemental agreement was not intended to modify the gas purchase contract. First, the gas purchase contract was included with the letter of July 26, 1974 and the gas purchase contract had been modified to include language almost identical to language found in the supplemental contract. Hence, the defendant would conclude that there is no need for the supplemental contract and that Wegman would not have modified the gas purchase contract if the supplemental agreement was applicable. Wegman counters that the changes made in the gas purchase contract were made only so that the contracts would contain similar instead of conflicting language.
The defendant also points out that the supplemental contract refers to Wegman and not to Wegman Ltd. However, Wegman testified that he always conducted business in his own name, even when it was for Wegman Ltd. Also, the assignment of the lease which this supplemental contract also covers was between Wegman Ltd. and CTI.
Last, the supplemental contract consistently refers to the parties as lessee and lessor and refers back to the original lease. The parties to the gas purchase contract are vendee and vendor. Wegman testified that the terms lessee and lessor were used consistently because he simply directed his secretary to use the same form that was used for the first supplemental agreement and simply change names and property descriptions. Hence, the "standardized" language was not corrected.
Last, Wegman points out that the gas purchase contract was not complete without the supplemental agreement. The gas purchase contract does not specify any well from which the gas is to be purchased. It simply refers to all leases that are described in "Exhibit A." There is no Exhibit A attached to the contract. Hence, the supplemental agreement provides the property description necessary to complete the gas purchase contract.
As previously discussed, the jury specifically found that the price and measurement provisions in the supplemental agreement applied to the Wegman-Hodge well. In light of the facts previously discussed and the inferences which the defense attempts to raise by quoting certain language from the letter to Swank from Wegman, we do not conclude that the jury was clearly wrong in reaching this determination. The terms used in the supplemental agreement were inappropriate but an habitual use of standardized language is understandable. Likewise, the interpretation of the language in the cover letters offered by Wegman is reasonable. Hence, we do not overturn this factual determination of the jury.

3. Voidance of the Contract
Defendant makes several arguments contending that the evidence was insufficient to void the original gas purchase contract because of alleged fraud or error of fact. However, these arguments are meritless. This case does not involve the avoidance of a contract. Neither the gas purchase contract nor the various leases were voided and replaced by the supplemental agreement. This is a case of separate documents being read together to determine the agreement between the parties. See: Admiral Paint Company v. Goltzman, 254 So.2d 104 (La.App. 3rd Cir.1971); LSAC.C. Art. 2045. Because we do not find that any contract has been voided, these issues need not be addressed.
*447 Defendant makes a similar argument in stating that the trial court created an unenforceable contract by applying language from the supplemental agreement to the gas purchase contract. The supplemental agreement required the negotiation of an equitable price if the gas was sold to someone other than the city of Monroe. The supplemental agreement allegedly makes the gas purchase contract unenforceable because the renegotiation makes the price uncertain and LSA-C.C. Art. 2464 requires that the price of a sale must be certain.
First, an invalid contract was not created. The two contracts are simply read together to establish the intent of the parties.
Further, whether the contract specifies a price or not, Wegman is entitled to be paid for his gas. The court must determine the fair market value of Wegman's gas and award him that amount minus payments already made. Wegman is entitled to a fair price, LSA-C.C. Art. 1995, and the court must make that determination.

4. Equity
Defendants argue that Wegman should not be allowed to complain that the price received was not in accordance with the contract since Wegman had the right to renegotiate the price at the end of the term of the gas purchase contract (approximately December, 1978) and, under the supplemental contract, the right to renegotiate even earlier. However, he did not attempt to renegotiate the contract until 1980. Defendant cites no authority for his proposition.
The premise of defendant's argument is that Wegman was satisfied with the price received and therefore he did not attempt to renegotiate the price. This is a correct statement. However, the reason that Wegman was satisfied with the price was because CTI failed to inform him that gas was being sold to someone other than the city of Monroe, as the supplemental agreement required CTI to do.
The evidence presented shows that Wegman agreed to a price of fifty cents per mcf because CTI would have to go to great expense to build a pipeline from the gas field to the city of Monroe. If CTI sold to someone with an existing pipeline, then plaintiffs would be entitled to a higher price. The jury found that CTI consciously misled the plaintiffs about the identity of the purchaser of gas. Furthermore, the jury found that CTI had sent plaintiffs statements which incorrectly stated the price on which royalties should have been based and incorrectly stated the amount of production from the well. Hence, based upon the information known to Wegman, he did not have a reason to be dissatisfied or to attempt to renegotiate the price until 1980. The reason Wegman was satisfied with the price until 1980 was CTI's misrepresentations and breaches of contract. One is not allowed to take advantage of a situation of his own making. Therefore, CTI may not now claim that Wegman acquiesced in the price received when Wegman was acting on incomplete information while CTI had the duty to supply the correct information. Oil Transport Co. v. Whiteman, 215 La. 1070, 42 So.2d 758 (1949); Fred H. Moran Const. Corp. v. Elnaggar, 473 So.2d 321 (La.App. 1st Cir. 1985).

MARKET VALUE
The jury found that royalties due plaintiffs should be based on the price for which CTI sold gas to IMC. This figure, minus a fifteen percent charge for transportation, also forms the basis of the price under the gas purchase contract. CTI attacks this finding claiming that the correct price to be used as the basis for determining royalty payments is the price paid by CTI to its limited partnerships. Moreover, in the event that the price paid to the limited partnerships is not considered fair market value, then the value set by the jury is too high and should be lowered.

1. Is Market Value Established by the Contract Price between CTI and the Limited Partnerships?
Defendant begins its argument by pointing to the royalty provisions contained *448 in the various leases. These provisions are similar and provide that on gas sold at the wells the royalty shall be a fraction of the amount realized from such sale. Contracts between CTI and the limited partnerships establish that title to the gas vested in CTI at the well. Therefore, claims CTI, since CTI purchased the gas from the limited partnerships at the well, the price paid the limited partnerships should be used to determine the royalty due plaintiffs.
The defendant also makes use of Mr. McDonald's statement at trial that the first sale of the gas was at the well. However, Mr. McDonald also stated that the contracts between CTI and its limited partnerships were not, in his opinion, legitimate contracts and should not be considered as the first sale.
Moreover, CTI filed Federal Energy Regulatory Commission Form 121 with the Federal Energy Regulatory Commission stating that the first sale of gas was by CTI to IMC. Form 121 enabled CTI to qualify for a higher maximum price as set by the FERC under authority of the Natural Gas Policy Act.
In trying to establish market value as the price paid by CTI to the limited partnerships, the defendant cites Henry v. Ballard and Cordell Corporation, 418 So.2d 1334 (La.1982) for the proposition that the market value of gas is established by a contract for the sale of that gas which is entered into in good faith at a fair market price when the contract was executed. We note that the Supreme Court emphasized that this rule does not apply where there is an allegation of bad faith or where the contract is unreasonable. That is not the case here.
The evidence presented at trial establishes that CTI failed to act in good faith for the mutual benefit of itself and the lessor as required by LSA-R.S. 31:129 and that it failed to fulfill the contractual obligations owed to plaintiffs. CTI controlled the limited partnerships and thus the price. CTI's filings with the FERC show that it did not consider the price paid to the limited partnerships to be market value. The evidence clearly shows that the contracts between CTI and its limited partnerships do not establish fair market value.

2. Deduction for Transportation In Arriving At Market Value
The defendant claims that this court may find that the difference between the price received by the limited partnerships and the price received by CTI was merely a transportation charge.
Defendant cites the cases of Wall v. United Gas Public Service Company, 178 La. 908, 152 So. 561 (1934) and Freeland v. Sun Oil Company, 184 F.Supp. 754 (W.Dist.La.1959). We find that these cases distinguishable from the one at bar. In both cases cited by defendant, the gas was transported out of the gas fields. Here, the gas was transported a distance of slightly over one mile to a major pipeline running through the gas field.
CTI's attempt to compare their "transportation" profit of $1.12 per mcf in 1982 to IMC's charge of $.90 per mcf for transportation in 1982 is much like comparing apples and oranges. The two transportation systems are simply not equivalent. The line operated by IMC is a major transportation line costing millions of dollars. The line operated by CTI is a small gathering line with a total cost slightly in excess of $30,000. CTI's gathering line does not contain any of the compression or dehydration units found on larger transportation lines.
Ample testimony was presented at trial that by industry custom lessors are not charged for the transportation of gas through small gathering lines. This is usually considered part of the cost of operating the well and therefore not charged against the lessor. Hence, because the use of the gathering system does not constitute a true "transportation cost" to be charged against the lessors, the jury was correct in denying defendant a credit.

3. Sufficient Evidence?
The defendant makes several arguments wherein it claims that the jury's *449 finding of the market value for the gas was either not established by the evidence or was too high. Market value is a question of fact, and it is up to the fact finder to determine the probative strength of relevant evidence. Piney Woods Country Life School v. Shell Oil Company, 726 F.2d 225 (5th Cir.1984). We find ample evidence upon which the jury could base its conclusion that market value was the price paid by IMC to CTI.
Extensive testimony was offered on the issue of fair market value. The general consensus of the expert witnesses was that the gas sold by Wegman to CTI under the gas purchase contract should have been purchased at the price received by CTI from IMC, minus a charge of fifteen to twenty cents for transportation. The transportation charge is allowed in this case since Wegman was selling the gas and is not a royalty owner. As to the various royalty interests, the expert testimony generally agreed that the price received by CTI from IMC was fair market value.
In further testimony considering fair market value, Mr. Edward Eubanks, vice president and general manager for IMC Exploration Company and IMC Pipeline Company, testified that IMC Exploration sets the fair market value pursuant to federal regulations and the FERC pricing schedule. In this case, the price received by CTI from IMC was in line with the FERC pricing schedule.
The jury determined that the royalties should be paid based on the price received by CTI from IMC. The price set for gas sold under the gas purchase contract was set as the price received by CTI from IMC minus fifteen cents per mcf. Also, CTI concealed from the plaintiffs the market value of the gas at the well. Based upon the evidence presented, we cannot say that the jury was clearly wrong in reaching these determinations.

MEASUREMENT OF AMOUNT OF GAS PRODUCED
Defendant has three main areas of complaint in the area of measurement. First, defendant contends that there is no evidentiary basis for the jury's determination that the quantity of gas produced from H-1, H-2 and H-3 should be measured by the readings of the well meters minus three percent. Defendant next complains that the limited partnership should not be bound by the unrecorded supplemental contract. Last, defendant contends that the trial judge erred in denying the jury the right to determine whether the issue of quantity had been settled by the parties, and that had the issue gone to the jury, the jury would have found that the issue had been settled by the parties.

1. Evidentiary Basis
Defendant contends that there is no evidentiary basis to support the jury's finding that the quantity of gas produced from the wells drilled on the B.J. Hodge lease should be determined by the reading of the well meters minus three percent. Defendant points out that the equation to determine quantity is supplied by the supplemental contracts and that the supplemental contracts are not even claimed to be applicable to the B.J. Hodge lease.
According to the various contracts and leases, CTI, or its agent, was required to properly measure the gas produced. LSA-R.S. 30:44. Furthermore, CTI was responsible for insuring that each meter was properly zeroed. LSA-R.S. 30:251. This was not done. Moreover, CTI comingled the gas produced by various lessees without obtaining proper permits from the Department of Conservation as required by the Department of Conservation Order No. 29-D (March 11, 1955). Because CTI failed to determine the correct amount of gas produced from the B.J. Hodge lease, the jury must determine the correct amount.
While the supplemental contracts are not applicable to these wells, there is an adequate evidentiary foundation for the jury's determination. The jury was presented expert testimony on the issue of measurement. The experts testified that line loss should not exceed five percent. Several *450 experts testified that the usual amount of line loss would be two percent or less. Thus, the expert opinion presented and the provisions of the supplemental agreement form an adequate basis for the jury's determination that quantity should be measured by the reading of the well charts minus three percent.
In light of the above, we conclude that there was substantial basis to justify the jury's determination that the quantity of gas produced should be measured from the well meters, less three percent.

2. Limited Partnerships Not Bound by Supplemental Contract
Defendant next contends that the limited partnerships should not be bound by the terms of the supplemental contracts because they were unrecorded. However, this issue is totally irrelevant. No liability was assessed to the limited partnerships in the trial court. The party liable was CTI. Under LSA-R.S. 31:129 an assignor is not relieved of his obligations or liabilities under a mineral lease unless specifically discharged in writing. CTI had not been discharged and was found to be liable based upon its obligations as a lessee and as a party to a contract.

3. Compromise
The defendant argues that the issue of measurement was settled by a compromise agreement between the parties. On October 8, 1980, Wegman sent a demand letter to CTI seeking payment of $11,007.10 as a result of improper measurement as revealed by an audit done by Wegman. In response to this letter CTI made payments totaling $8,696.97 to Wegman and $981.83 to Hodge. With the February 19, 1981 payment, CTI sent a cover letter stating that this was the "final payment as a result of the gas audit. Please let me know if you have any further questions."
Defendant errs in contending that the trial judge prevented the jury from considering the issue of compromise. The trial judge initially ruled that the jury could not consider the issue because it was not properly pled by defendants. However, the trial judge apparently reconsidered and allowed the jury to rule on the issue.
The jury interrogatories contained the following question: "Did Mr. Wegman and CTI enter into an act of compromise settling any differences between them? If so, what was the act of compromise and what differences were settled?" The jury answered, "settled some, but unable to settle all due to CTI's failure to return calls." Hence, the issue was reached and there was no error committed by the trial court.
The jury did not find that the issue had been fully compromised. However, a credit was given the defendant in the final judgment for the payment mentioned above. We find no error and conclude that defendants contention is without merit.

DAMAGES
In their claim for damages, plaintiffs also sought penalty damages, plus interest and attorney's fees pursuant to LSA-R.S. 31:140, which provides that "the court may award as damages double the amount of royalties due, interest on that sum from the date due, and a reasonable attorney's fee" when a lessee fails to pay royalties due or fails to inform the lessor of a reasonable cause for failure to pay after receipt of the required notice from the lessor.
The original jury award is as follows: to Hodge, $45,647.28; to Wegman, $42,216.26; and to Wegman Ltd., $138,066.19. The amount of the awards are equal to twice the amount claimed by plaintiffs, plus onethird as attorney fees.
Defendant filed a motion for judgment notwithstanding the verdict in the trial court. After considering the motion, the trial court modified the judgment as follows: to Hodge, $42,421.22; to Wegman, $53,247.49; to Wegman Ltd., $39,840.12. Defendant now raises additional issues as to the amount of the judgment resulting from the motion for JNOV. In order to consider defendant's arguments, the trial court judgment is broken down as follows:

*451
 JNOV
 WEGMAN
AWARD TO: HODGE WEGMAN LTD.
FOR:
1. H-1,H-2,H-3 5,813.39 -0- -0-
2. BJH 2,862.81 1,252.48 465.21
3. W-1,W-2 -0- 11,823.47 -0-
 ________ _________ ______
4. Subtotal 8,676.20 13,075.95 465.21
5. Damages of Double the Amount of
 line 4 17,352.40 26,151.90 930.42
 _________ _________ ______
6. Subtotal 25,928.60 39,227.85 1,395.63
7. Attorneys Fee (1/3) -0- -0- 465.21
 _________ _________ ________
8. Subtotal 25,928.60 39,227.85 1,860.84
9. W/H 6,769.15 2,961.50 44,422.52
 _________ _________ _________
10. Subtotal 32,797.75 42,189.35 46,283.36
11. Credit for Partial Payment 981.83 2,253.73 6,443.24
 _________ _________ _________
12. Subtotal 31,815.92 39,935.62 39,840.12
13. Attorneys Fee (1/3) 10,605.30 13,311.87 -0-
 _________ _________ _________
14. TOTAL 42,421.22 53,247.49 39,840.12

Defendant contends that the trial judge erred in doubling the amount of the award (line 5) and then adding that figure to the actual damages (line 4) thereby giving plaintiff three times the amount of actual damages (line 6 vs. line 4). As previously noted, the jury awarded double the amount of damages instead of doubling the damages and adding that sum to the amount of royalties due. Defendant asserts that the different method of calculation used by the trial judge is not allowed because of the rules governing a motion for judgment notwithstanding the verdict and because the awarding of damages under LSA-R.S. 31:140 is discretionary. CTI does not claim that the award is more than authorized by statute.
First, we agree with defendant's interpretation of LSA-R.S. 31:140. After certain statutory procedures are followed (LSA-R.S. 31:137 and 31:138), a lessee must make a written response or payment within thirty days of receipt of a notice from a lessor that payment is due. Under R.S. 31:140 if the lessee fails to pay royalties due or fails to inform the lessor of a reasonable cause for failure to pay in response to the required notice, the court may award as damages double the amount of royalty due. Hence the award is discretionary.
The defendant also argues that the trial judge did not have the authority to modify the jury award of damages because this is a substantive change and not a change to correct errors of calculation. LSA-C.C.P. Art. 1951 provides that "a final judgment may be amended by the trial court at any time, with or without notice, on its own motion or on a motion of any party: (2) to correct errors of calculation." Defendant contends that the trial judge's awarding double damages is not the correction of an error in calculation but a substantive change. Defendant contends that since plaintiff did not file the motion for judgment notwithstanding the verdict, the trial judge must have fictionally provided a motion JNOV for the plaintiffs. Assuming that this is correct, the defendant continues, the court should consider all of the evidence in the light of and with all reasonable inferences most favorable to the party opposed to the motion, i.e., the defendant. Since the jury did not award double damages, this court must conclude that the trial judge erred in awarding double damages.
We do not agree with defendant's characterization of this amendment to the jury *452 award by the trial judge as a substantive change based on a fictional motion JNOV. The only reasonable inference possible is that the jury intended to award double damages but did not completely understand the proper method of calculation, especially in light of the specific jury finding that the remedy of damages was inadequate to do justice and that the leases should be cancelled.
We agree that LSA-C.C.P. Art. 1951 "has no application in reformation of jury verdicts." Connor v. Florida Farm Bureau Casualty Insurance, 446 So.2d 383 (La.App. 3rd Cir.1984). However, under the facts of this case, it is clear that the trial judge's calculation of plaintiff's award as royalties due, plus twice the amount of royalties due, as opposed to the jury's award of twice the amount of royalties due, was not a substantive change, but was done to correct an error in calculation under Art. 1951. The principal amount due the plaintiffs was not changed by this recalculation. Thus, the verdict was not reformed. Although the jury may award as damages any amount up to double the amount of royalties due, we do not believe that the jury would have failed to award the maximum amount of monetary damages when it also found that monetary damages were inadequate to provide a complete remedy. Furthermore, it is easily understood how the jury may have been confused about how to calculate damages as double the amount due. Compare: Connor, supra; Edwin M. Jones Oil Company, Inc. v. Cobb, 469 So.2d 357 (La.App. 2d Cir.1985).

ATTORNEYS FEE
Both parties agree that the award of attorney's fees to Hodge and to Wegman is excessive (Line 13 above). This award is excessive because the one-third factor mistakenly applies to the amount awarded on the W/H Well. The W/H Well award is not subject to attorneys fees because it is an award under a gas purchase contract. Attorney's fees are available only for the failure to pay royalties due under a lease.
Accordingly, the award to the plaintiffs is amended and correctly calculated as follows:

 AMENDED JUDGMENT
 WEGMAN
AWARD TO: HODGE WEGMAN LTD.
FOR:
1. H-1,H-2,H-3 5,813.39 -0- -0-
2. BJH 2,862.81 1,252.48 465.21
3. W-1,W-2 -0- 11,823.47 -0-
 -------- --------- ------
4. Subtotal 8,676.20 13,075.95 465.21
5. Damages of Double the Amount of
 line 4 17,352.40 26,151.90 930.42
 --------- --------- ------
6. Subtotal 25,928.60 39,227.85 1,395.63
7. Less Partial Payment on W1&W2 -0- 1,824.18 -0-
 --------- --------- --------
8. Subtotal 25,928.60 37,403.67 1,395.63
9. Attorney Fee (1/3) 8,556.55 12,343.21 465.21
 --------- --------- --------
10. Subtotal 34,485.04 49,746.88 1,860.84
11. W/H 6,769.15 2,961.50 44,422.52
 --------- --------- ---------
12. Subtotal 41,254.19 52,708.38 46,283.36
13. Less Partial Payment on W/H 981.83 429.55 6,443.24
 --------- --------- ---------
14. TOTAL 40,272.36 52,278.83 39,840.12

COSTS
Defendant contends that the trial judge abused his broad discretion under LSA-C. C.P. Art. 1920 in assessing costs. However, the hearing on the rule to assess costs was not transcribed and presented to *453 this court. Defendant filed with this court a motion to supplement the record. This motion was granted on May 27, 1986. However, the record has never been supplemented. Defendant realized that because of this "no action of this court can be presently requested on this subject." Defendant is correct and this issue is not considered.

LEASE CANCELLATION
The jury concluded that the overall conduct of CTI was such that damages were inadequate to fully do justice to plaintiffs. Therefore, the trial judge ordered cancellation of the leases. Defendant points out that dissolution of a lease is not a favored remedy. LSA-R.S. 31:141 provides that "in a case where notice of failure to pay royalties is required, dissolution should be granted only if the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice." CTI also claims that it no longer owed a duty to the lessors.
CTI continued to owe the plaintiffs all of the obligations and liabilities originally imposed by the lease. LSA-R.S. 31:129. CTI was never relieved of its duties and responsibilities by the plaintiffs.
Although dissolution is not favored, it should be granted when the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice. In answer to interrogatories presented to the jury, the jury found that the conduct of the lessee (CTI) was such that the remedy of damages was inadequate to do justice. The jury found that the defendants concealed from Hodge and Wegman the market value of the gas at the well and the amount of production from the wells. Likewise, they found that defendant consciously mislead the plaintiffs about the identity of the purchaser of the gas. Moreover, CTI sent plaintiffs statements incorrectly stating the price upon which royalties should have been based and the amount of production from the wells. The evidence presented at trial adequately supports the findings of the jury. The factual findings of the jury were correct, as was its determination that the actions of CTI in failing to pay royalties due was such that the remedy of damages was inadequate to do justice.

INTEREST ON ATTORNEYS FEE
The trial court's judgment provides for a lump sum award to Wegman, Wegman Ltd. and Hodge "with legal interest from date of judicial demand until paid." Defendant contends, and plaintiff agrees, that legal interest on the award for attorneys fee should only run from date of judgment.
In Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978) the Louisiana Supreme Court held that interest on attorneys fees should run from the date of judgment because the amount of attorneys fees due was not ascertainable until awarded by the court. See: Ahlers v. Ahlers, 384 So.2d 474 (La.App. 2d Cir.1980); Little v. Kalo Laboratories, Inc., 424 So.2d 1065 (La.App. 2d Cir.1982). Therefore, legal interest on the amount awarded as attorneys fees should run from date of judgment until paid.

CONCLUSION
For the reasons assigned, we find that the decision of the trial court should be affirmed, but amended in order to correct an excessive award of attorneys fees and to provide legal interest on the attorneys fee award from date of judgment until paid. Therefore, the judgment of the trial court is amended and recast as follows:
IT IS ORDERED that there be judgment in favor of plaintiff, W.J. Wegman, Jr., and against defendant, Central Transmission, Inc., in the amount of THIRTY NINE THOUSAND NINE HUNDRED THIRTYFIVE *454 AND 62/100 ($39,935.62) DOLLARS with legal interest from date of judicial demand until paid and TWELVE THOUSAND THREE HUNDRED FORTYTHREE AND 21/100 ($12,343.21) DOLLARS as attorneys fees, with legal interest from date of judgment until paid;
IT IS FURTHER ORDERED that there be judgment herein in favor of plaintiff, Joe Wegman, Jr., Ltd., and against defendant, Central Transmission, Inc., in the amount of THIRTY-NINE THOUSAND THREE HUNDRED SEVENTY-FOUR AND 91/100 ($39,374.91) DOLLARS with legal interest from date of judicial demand until paid and FOUR HUNDRED SIXTYFIVE AND 21/100 ($465.21) as attorneys fees, with legal interest from date of judgment until paid; and
IT IS FURTHER ORDERED that there be judgment herein in favor of plaintiff, Bobby Joe Hodge, and against defendant, Central Transmission, Inc., in the amount of THIRTY-ONE THOUSAND, SEVEN HUNDRED FIFTEEN AND 92/100 ($31,715.92) DOLLARS with legal interest from date of judicial demand until paid and EIGHT THOUSAND FIVE HUNDRED FIFTY-SIX AND 44/100 ($8,556.44) DOLLARS, as attorneys fees, with legal interest from date of judgment until paid.
The trial court judgment cancelling the leases made the subject of this suit is affirmed.
All costs of this appeal are assessed to defendant.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Southern one-half of the Southern one-half of the Southwest quarter of the Northeast quarter of Section 14, Township 20 North, Range 2 East, Union Parish, Louisiana.
[2] The property covered by this lease is described as the Northern one-half of the Northern onehalf of the Southwest quarter of the Northeast quarter of Section 14, Township 20 North, Range 2 East, Union Parish, Louisiana.
[3] Leased property is described as in Northern one-half of the Southeastern one-quarter of the Southeastern quarter and the Southern fiveeighths of the Northeast quarter of the Southeast quarter of Section 15, Township 20 North, Range 2 East, Union Parish, Louisiana.