CARAWAY, J.,
concurring.
IU concur to address this unique fact setting involving the mineral lessee/operator’s failure to pay lease royalties. In the absence of the receipt of a portion of the unpaid royalties by one of the succession representatives, the full force of the punitive remedies of the Mineral Code, La. R.S. 31:137-141, could have been imposed. Those remedies are designed to protect the lessee from the harshest consequence of its breach of contract. Before the Mineral Code, the remedy of dissolution of the lease was a much greater threat to the lessee. See, Official Comment Mineral Code Article 137, La. R.S. 31:137. In this case, we do not rescind these leases with 19 producing wells in Section 8 for Samson’s nonpayment of the royalties. Instead, we reduce the punitive damages authorized by the Mineral Code to one-fourth of the maximum amount .that arguably could have been imposed.
The voluminous Section 8 wells produced an embarrassment of riches where both sides attempt to hide. The Mineral Code provisions, however, place the prime responsibility on Samson to properly make payment of royalties for its leases no matter how many wells were producing. Samson initially suspended royalty payments due to the dispute over the validity of the Connell donation. Then, in June 2006 with the dispute resolved, Samson recognized the standing of the Connell Succession to *982 receive the suspended royalties and, in July, paid $946,237.88 for part of the Section 8 royalties affected by the disputed donation. A complete accounting for the royalties attributable to the disputed Con-nell donation in the summer of 2006 would have revealed to the succession representatives Samson’s failure to have suspended an additional $1,301,149.13 (hereinafter the “$1.3M”) for 6 other wells, and, most importantly, Mark Smith’s receipt of part of the $1.3M | ¡¡along with his father and brother. Had that complete accounting been made by Samson in June and July of 2006, could the Succession’s claim for the Mineral Code’s punitive measures be heard? I think not, as the embarrassment of riches should have amicably resolved the matter.
Yet, Samson’s failure to explain, account, and pay continued. In October 2006, Samson’s concursus allegations admitted, in my view, that all royalties attributable to the disputed ½ Connell interest should have been suspended since April 2004 and were due and payable in 2006 to the Succession because of the rescission of the Connell donation.
The concursus effectively admitted: (i) Samson received notification in April 2004 and properly suspended royalty payments pending resolution of the Connell donation dispute, (ii) Samson operated 19 wells in Section 8 including the six wells which generated the $1.3M in royalties, (iii) the Connell Succession was still under administration with duly appointed co-administrators, (iv) gas from the six wells had been produced and marketed before the filing of the concursus, and. (v) Samson received notification of the judgment nullifying the Connell donation. Nevertheless, despite these basic admissions surrounding the donation dispute and Samson’s acknowledgment of the pending Connell Succession, the concursus erroneously reached one most important legal conclusion and was entirely vague and incomplete regarding the $1.3M accounting issue at the center of this dispute.
Paragraph 19 of the concursus petition expressed an improper legal conclusion as follows:
The nullity of the donation from Effie Smith Connell to IsBilly Jean Smith would result in Billy Jean and the succession of Betty Smith Robinson each owning one-half (⅜) of the minerals produced from property upon which the parties claim lease royalties.
From all that had been alleged, however, the Connell family’s ownership for the entirety of the royalty interest for the Samson leases following the nullification of the donation was: Billy Jean Smith % Succession of Betty Smith Robinson % and the Succession of Effie Smith Connell ½. Despite Samson’s recognition in Paragraph 19 of the Robinson succession, Samson erroneously ignored the Connell Succession’s rightful administrative claim to the suspended and future royalties, effectively incorporating a de facto judgment of possession for the Connell ½ interest in favor of her son and her daughter’s succession. In my view, with all that Samson alleged in the concursus, royalties for all 19 wells in Section 8 attributable to the ⅜ mineral interest involved in the Connell donation were shown as due and payable to the Succession of Connell no later than the filing date of the concursus, and probably months before. La. R.S. 9:1516; La. R.S. 31:137, et seq. Instead, Samson asserted that those royalties had already devolved to the presumed descendants of Connell before the Succession’s formal conclusion.
Additionally, Samson never directly addressed its $1.3M problem in the concur-sus. In Paragraph 6, the pleading identified the six wells drilled after Samson’s suspension of the royalties in 2004. The *983 pleading further alleged that gas production had previously accrued from those wells. Yet, it never revealed that $1.3M in royalties attributable to the suspended ½ l4mineral interest was paid out to the Smith family members.[1] It ambiguously asserted that prior to the nullification of the Connell donation, “Samson had paid some royalties based on” that donation. With part of the focus of the concursus on the prior accrual of royalties for these six wells and the possibility of past “over-payments” to the named defendants, including the Smith family members, Samson completely failed again to specifically advise the Succession that its co-administrator had erroneously been paid royalties, after the suspension for the disputed Con-nell donation.
If the donee of the Connell donation had been a third party outside of the family who had erroneously received $1.SM in royalty payments, the Succession’s demand for those unpaid royalties under the Mineral Code after revocation of the donation would trigger within 30 days a full accounting, payment of suspended royalties, and payment of the $1.3M paid in error to the wrong party. Nevertheless, taken as a whole, Samson’s concursus suggests by its silence that payment of the $1.3M to the Smiths as presumed heirs was not in error and by its allegation in Paragraph 19 that the Succession was owed no royalties. With the recognition of a succession’s standing in our law, La. C.C.P. art. 3191(A), and specifically in La. R.S. 9:1516, Samson’s admissions on the face of the concursus demonstrate to me a clear violation of its obligation under the Mineral Code to pay the Succession royalties attributable to the ½ Connell interest, including the $1.3M.
|RAs indicated above, Samson’s nonpayment of the $1.3M in royalties in this case could have produced punitive damages in the amount of $2.6M based upon jurisprudence of this court. Wegman v. Central Transmission, Inc., 499 So.2d 436 (La. App. 2d Cir.1986), writ denied, 503 So.2d 478 (La.1987). The Mineral Code states that “[t]he court may award as damages double the amount of royalties due.” La. R.S. 31:139. The Official Comment speaks of the punitive damages as follows: “[T]his compensating remedy is the award of double the amount due.” Official Comment, La. R.S. 31:137. Under the general law of conventional obligations, • the measure of damages when the object of performance is a sum of money is interest. La. C.C. art. 2000. This clear distinction between the performance owed or amount due and damages indicates that the double punitive damages awarded in Wegman over and above the amount of royalties due was the correct measure of the maximum penalty' for nonpayment of royalties. Such award is also in keeping with the redactors’ concern that the very harsh loss to the lessee of great value by lease rescission should be, for the‘most part, avoided in favor of a meaningful punitive remedy to the lessor. Id.
In this case, I believe $650,000 in punitive damages is meaningful, instead of lease rescission, and is the maximum punitive measure allowable. I disagree with the majority’s statement that this reduction from the maximum punitive remedy results somehow from the type of egregious conduct exhibited by Samson. Non *984 payment of royalties, like nonpayment of rents for a predial lease, is a breach of contract, and rescission of the contract, which remains a possible remedy, indicates to me that nonpayment alone is .egregious enough. The amount of nonpayment in this instance, |fiwhich Samson somehow never quite determined until 2007, is an egregiously large and unjustified amount.
With that said, however, I believe $650,000 is the maximum allowed penalty for this case because Mark Smith, as the co-administrator of the Succession, had a fiduciary duty to account for the $1.3M that he and his family received. Code of Civil Procedure Article 3191(A) required Mr. Smith to collect all property of the Succession as a fiduciary. His duty extended to reviewing the royalty payment data he had received for his personal royalties on all Section 8 wells, including the •six wells in question. As discussed above, Samson, did not specifically report to him in the summer of 2006 (or thereafter, with its coneursus pleading) that he had been paid a portion of the $1.3M. Nevertheless, Samson’s counsel’s letter of. March 15, 2007, reported enough information of the overpayments on the six wells for Mark Smith to immediately account as fiduciary for his receipt of those royalties. In that 2007 letter, Samson finally provided enough information to allow Mr. Smith and the other Smith heirs to resolve the issue with the Succession.
Thus, the inordinate delay preceding Samson’s 2007 report amounts to improper payment of royalties and failure to identify what it now asserts as a reasonable, cause for nonpayment. Samson’s overpayment of royalties to presumed heirs and not to the duly authorized Succession is a nonpayment of royalties sanctionable by the punitive damages of the Mineral Code. Accordingly, I respectfully concur.

. Significantly, the Mineral Code requires the lessee to respond to the lessor, when appropriate, by stating a reasonable cause for nonpayment of royalties. La. R.S. 31:138. Samson’s defense appears to be that it properly paid the Smiths and therefore the Succession is owed nothing. Yet, even with the filing of the concursus, Samson never reported to the Succession its justification for the nonpayment of the $1.3M.