United States Court of Appeals,

Fifth Circuit.

No. 92-3370.

Richard L. CONKLING, Plaintiff-Appellant,

v.

Bert S. TURNER, et al., Defendants-Appellees.

April 20, 1994.

Appeals from the United States District Court for the Middle District of Louisiana.

Before REYNALDO G. GARZA, KING and DeMOSS, Circuit Judges.

KING, Circuit Judge:

Plaintiff Richard L. Conkling ("Conkling") appeals a take-nothing judgment rendered against him based upon his claims for violations of the Racketeer Influenced and Corrupt Organizations Act[1] ("RICO"), breach of fiduciary duty, and breach of contract under Louisiana law. Finding no error with the trial court's resolution of the RICO and breach of contract claims, we affirm the district court's judgment in those regards. However, we find that the district court erred in granting summary judgment on the breach of fiduciary duty claims, as discussed below, and reverse and remand that portion of the case.

I. Background

This case has its origins in 1961, when defendant Bert S. Turner ("Turner") recruited Conkling to work for a corporation that Turner was forming with L.W. "Puna" Eaton, Jr. ("Eaton"). The

_____

[1]Title IX of the Organized Crime Control Act of 1970, Pub.L. No. 91-452, 84 Stat. 922 (codified at 18 U.S.C. § 1961 et seq.).

1

corporation, Nichols Construction Corporation ("Nichols"), was formed on December 28, 1961. Conkling went to work for Nichols in January 1962. Conkling alleges that Turner represented at the time that he would give Conkling stock in Nichols and all later-formed entities if Conkling would make a long-term commitment to Nichols and that such stock would be redeemed at a fair price when Conkling's employment ended. Conkling claims he accepted this offer.

A. The Nichols Agreements

In November 1962, Turner had a document prepared (the "1962 agreement") which provided for the issuance of 10 shares, or 5%, of Nichols' stock to Conkling, and 10 shares each to two other minority shareholders, Carmen St. Clair ("St. Clair") and J.B. Millican ("Millican"). The 1962 agreement also provided that Turner and Eaton would each receive 85 shares, or 42.5%, of the Nichols stock. The price set forth in the document for the stock was $1,000 per share. Conkling, St. Clair, and Millican were each to give a $10,000 one-year note for his shares, and the document provided that Nichols would hold his shares until the notes were paid. Each of the parties executed the 1962 agreement.

Both Conkling and Turner testified that all parties agreed not to follow this agreement after it was executed. In fact, Turner and Eaton were apparently successful in obtaining financing after the 1962 agreement was executed, and purportedly paid only $500, rather than $85,000, for their shares. Conkling also claims that, several days after Turner presented this document, Turner gave

2

Conkling his stock certificate for 10 shares, telling him that he was receiving the stock for services Conkling had previously performed for Nichols and that he would not have to pay the $10,000 note unless Nichols failed. Defendants stipulated that, according to Nichols' records, Conkling was issued 10 shares of Nichols' stock on November 15, 1962.

Six months later, in May 1963, Nichols redeemed Eaton's 85 shares at Turner's direction. According to Conkling, Turner engaged in questionable practices related to his negotiations with Eaton, including ordering the reporting of profits on certain Nichols jobs to be delayed and instructing Conkling to withhold a number of profitable jobs from Nichols' financial statement. Turner also allegedly misrepresented to Eaton the value of Nichols' equipment in order to avoid paying him a greater amount for redemption of his stock. Conkling alleged that the redemption of Eaton's stock increased his proportionate ownership of Nichols from 5% to 8.69565%.

In June 1963, Turner directed his lawyer to prepare another document (the "1963 agreement") which recited that Turner owned 100% of Nichols. This agreement set forth the terms for Conkling and the other minority shareholders to purchase an 8% interest in Nichols. The document also contained a right of first refusal and specific formula for redemption of any Nichols' stock; however, that provision was subsequently deleted by agreement in August of 1966. Without telling Conkling anything beyond the contents of the document, Turner stood over Conkling as Conkling read and signed

3

the document.  Conkling argues that, as a result of Turner's concealment and misrepresentations, Conkling relinquished his 8.69565% interest and purchased an 8% interest in Nichols.

B. The Nichols Affiliates

Over the years, Nichols prospered and new companies were formed by Turner.  The original Nichols shareholders had an oral agreement to share proportionate ownership in any direct affiliates or spin-off companies of Nichols.  The relative ownership relationship for the affiliate companies was to be based upon the original ownership ratio of Nichols.  The following companies, formed as affiliates, spin-offs, or alleged affiliates of Nichols, form the basis of Conkling's complaint.

1. National Maintenance, International Maintenance, TSMC, BTL, TL, and Crest

In 1970, Nichols spun off a corporation to conduct maintenance work previously done in Nichols' name and transferred almost $1,000,000 worth of assets to the newly formed company, named National Maintenance Corporation ("National Maintenance"). Conkling purchased an 8% interest in National Maintenance in accordance with the relative ownership agreement between the original Nichols founders.  Similarly, International Maintenance Corporation ("International Maintenance") was formed in 1971, and, although no stock was issued until 1977, Conkling was able to purchase an 8% interest in that company as well.

In 1971, TSMC Company ("TSMC") was formed as a partnership designed to be supported exclusively by income from rental of construction equipment to Nichols' affiliates on a cost-plus basis.

4

Conkling received an 8% interest in this partnership. T.L. Company ("TL") and BTL Company ("BTL") were also partnerships whose revenues came from the rental of construction equipment to Nichols and affiliates on a cost-plus basis. Conkling purchased 8% interests in each in 1978 and 1980, respectively. Crest, Inc. ("Crest") was formed as a Texas corporation to pursue construction opportunities in that state. Conkling acquired an 8% interest in Crest in August of 1974.

2. TIL

In October of 1981, Turner formed Turner Investments, Ltd. ("TIL"), wholly owned by Turner and his family, to hold his interests in Nichols and another related company. It subsequently became the chief operating company over Nichols and its affiliates, consolidating executive management, data processing, and accounting personnel for these companies. TIL billed Nichols and its affiliates for its services, and Conkling asserted that the billings were excessive.

3. Blast, Trebco, and IPS

In August of 1975, Turner formed Blast Corporation ("Blast"), which subsequently entered the residential construction market under the name S & S Homes, Inc. ("S & S"). Turner supposedly told Conkling that Blast was a mere shell, and Conkling did not purchase an interest in the company. After sustaining losses, S & S was changed back to Blast, and the company was purchased by Nichols in August of 1977.

Trebco Corporation ("Trebco") was formed in September of 1983

5

to perform non-union industrial construction and maintenance work in Texas. Conkling claims that Turner concealed Trebco so that he would not be able to purchase an interest in the company. Turner directed Nichols to lend up to $600,000 to Trebco for working capital, but the company was relatively unsuccessful, reporting heavy operating losses. Trebco was subsequently sold to Nichols on October 9, 1984, although the stock certificate effecting the transfer was backdated to November 1, 1983.

Nichols also spun off its entire pipe fabrication division and formed International Piping Systems, Ltd. ("IPS") in July of 1982. In the process, Nichols also transferred approximately $200,000 worth of assets to the newly-formed company. The stock in IPS was originally issued to TIL, Turner's family-owned company, although Conkling claims he was told it would be issued to Nichols. During the time the IPS stock was owned by TIL, Nichols guaranteed $7,000,000 in bonded indebtedness on behalf of IPS and loaned money to the company. Conkling alleges that, in December of 1983, when he discovered that the IPS stock had been issued to TIL, rather than to Nichols, he brought the ownership issue to Turner's attention, and Turner fired him. All of the stock in IPS was subsequently acquired by Nichols in April of 1984 for the same price as had been paid by TIL.

4. Harmony

On the same day Blast was formed, in August of 1979, Turner also formed Harmony Corporation ("Harmony"). Turner has apparently admitted that he concealed the creation of Harmony from Conkling.

6

The stock in Harmony was issued originally to unrelated parties, but was subsequently acquired by Nichols and then Turner. Conkling learned of Turner's ownership of Harmony and made repeated requests to purchase an interest in the company. Although Turner takes the position that Conkling was never entitled to purchase his relative ownership interest in Harmony, he allowed Conkling to purchase 5,161 shares on March 14, 1980, for $1.00 per share. Conkling understood that this quantity of shares would make him an 8.69565% owner of the company. However, later that day, an additional 33,450 shares of Harmony were issued to Harmony's president, C.N. "Bones" McLellan, Jr. ("McLellan"), thus diluting Conkling's interest. McLellan testified that he was told he was to hold the new shares as a nominee for Turner and that they were to be subject to Turner's secret option to purchase. In fact, although McLellan gave a note to Harmony for the purchase price of these shares, the obligation was later cancelled when Turner purchased the shares by executing a note to Harmony in the same amount.

5. Merit, Merit Environmental, and Gymco

Merit Industrial Constructors, Inc. ("Merit") and its wholly-owned subsidiary, Merit Environmental Services, Inc. ("Merit Environmental") were Louisiana corporations created in early 1982 to perform non-union industrial and environmental construction and maintenance work. Merit was a competitor of Harmony's. Although Turner has never been a named owner of Merit, Conkling claims that there is sufficient evidence to show that he secretly owns the company. The undisputed evidence reveals that Turner has supplied

7

Merit with significant cash infusions and has guaranteed loans for the company with Louisiana National Bank ("LNB"), a bank on whose board of directors Turner sits. Turner has also guaranteed lines of credit and performance bonds on behalf of Merit. Although the owners of record have executed a promissory note in favor of Turner, it appears that no interest has been paid on this note since 1983 and that the principal has only been reduced by payments.

After Conkling heard rumors that Turner owned Merit, he requested that he be allowed to purchase his relative ownership interest in the company. Turner denied ownership in Merit, and Conkling never acquired an interest in the company. Conkling also asserts that Turner has used Merit to compete with Harmony, sometimes using Harmony's confidential information to its detriment.

Gymco was a Louisiana partnership formed by the owners of Merit to purchase equipment exclusively for rental to Merit. Conkling claims that Turner also secretly owns Gymco, as evidenced by the fact that Turner guaranteed indebtedness of Gymco and reported certain tax effects on his income tax returns with respect to Gymco such as would signify ownership.

C. Discussions About Redemption of Conkling's Stock

As noted above, Conkling was fired from Nichols in December of 1983, and, not surprisingly, the parties dispute the reason for his termination. After termination, the parties attempted negotiations for the purchase of Conkling's stock in Nichols and its affiliates,

8

but were unable to agree to a price. One year later, Conkling sent a letter to Turner offering to sell these interests for $7,000,000. Although Conkling now claims that he had a binding agreement with Turner to redeem the stock at a "fair price," the letter made no reference to any such obligation. Turner never responded to the letter, and this lawsuit followed.

D. The Instant Litigation

In November 1985, Conkling filed suit against Turner and numerous corporations and partnerships controlled by Turner. He also sued David R. Carpenter ("Carpenter"), who served as Chief Financial Officer of Nichols and in various other capacities to the Nichols spin-off companies. Conkling alleged civil RICO violations under 18 U.S.C. §§ 1962(c) & (d). He also alleged pendent claims under Louisiana law for breach of fiduciary duty and breach of contract. His primary contention was that he was entitled to own 8.69565% of Nichols, but was defrauded out of the additional .69565% in Nichols by the 1963 agreement. He argues that he was consequently deprived of the additional .69565% interest in several of the Nichols-affiliated companies based upon the application of the Nichols ownership ratio. Conkling also claimed that Turner schemed to prevent Conkling from acquiring any ownership interests in several other, newly-formed companies by misrepresenting or concealing Turner's ownership of these companies. Conkling alleged mail fraud because Turner used numerous mailings to deceive Conkling and securities fraud with respect to certain of the stock transactions.

9

After a protracted discovery, the defendants filed motions to dismiss and for summary judgment. A lengthy joint pre-trial order defining the issues for trial was signed by the judge on October 17, 1991, and filed on October 21, 1991 (the "pre-trial order"). Prior to trial, by order entered January 21, 1992 (the "pre-trial summary judgment"), the district court granted the defendants' summary judgment motions in part, dismissing (i) Conkling's RICO predicate act based upon Turner's alleged refusal to redeem his stock in Nichols and affiliates, (ii) certain derivative claims, (iii) Conkling's claims for wrongful discharge, denial of access to corporate records, and damages due to the corporations' use of an unfavorable depreciation method, (iv) all claims against Carpenter, and (v) certain miscellaneous claims not discussed in this appeal. In response to requests from both parties, the district court clarified the pre-trial summary judgment by order of February 5, 1992 (the "clarification order"), to confirm that it had "dismissed all claims which are shareholder derivative claims in nature, including any claim involving Harmony to the extent that such claim is derivative."

The weekend before trial, the district court announced that it would sever the issues to be tried and would try only a single alleged predicate act—fraud in the 1963 agreement—with respect to Conkling's civil RICO claims in the first phase of trial. The court also stated that the breach of contract claim would be tried in this initial phase. After Conkling presented his case, both parties moved for judgment as a matter of law; the district court

10

granted the defendants' motion with respect to Conkling's breach of contract claims.  The 1963 agreement issue was submitted to the jury, which found that Turner did not commit fraud in the 1963 agreement.  As a result of the jury's verdict on this issue, the district court, on April 9, 1992, entered summary judgment in favor of the defendants on the remainder of Conkling's complaint, both under civil RICO and breach of fiduciary duty (the "post-trial summary judgment").  The instant appeal ensued.

## II. Analysis

### A. The Severance Order

Conkling first contends that the trial court abused its discretion in severing from his RICO case all predicate acts except for his claim that Turner defrauded him into executing the 1963 agreement.  Essentially, the trial court determined that Conkling would not be able to show any pattern of racketeering activity unless he could show that the agreement he and Turner entered into in June 1963 was fraudulently induced.  Thus, the trial judge deemed it appropriate to try this issue alone before proceeding to any other acts that could be predicate acts for the RICO claims. In fact, after the jury determined that Turner had not defrauded Conkling with respect to the 1963 agreement, the court below dismissed the entire RICO case as a matter of law on the basis of this finding.

Severance is proper when a trial court determines that severance is "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition or

11

economy." FED.R.CIV.P. 42(b); *see also FDIC v. Selaiden Builders, Inc.,* 973 F.2d 1249, 1253 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1944, 123 L.Ed.2d 650 (1993). We review a severance order for an abuse of discretion, recognizing that the decision to bifurcate "is a matter within the sole discretion of the trial court." *First Tex. Sav. Ass'n v. Reliance Ins. Co.,* 950 F.2d 1171, 1174 n. 2 (5th Cir.1992). An "abuse of discretion exists only when there is "definite and firm' conviction that the court below committed clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Hoffman v. Merrell Dow Pharmaceuticals, Inc. (In re Bendectin Litig.),* 857 F.2d 290, 307 (6th Cir.1988) (citation omitted), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989).

To determine whether the severance order was proper in this case, we must first evaluate the basis of the RICO claims. Section 1962(b) of Title 18 makes it unlawful "for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). While the RICO statute is by no means clear in many of its provisions, it does provide explicitly that there must be a "pattern" of racketeering activity and that "pattern" is defined to "require[ ] *at least two* acts of racketeering activity." 18 U.S.C. § 1961(5) (emphasis added); *see also H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 237-38, 109 S.Ct. 2893, 2899-2900, 106 L.Ed.2d

12

195 (1989); *McLaughlin v. Anderson,* 962 F.2d 187, 192 (2d Cir.1992) (noting that the "bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts"). The trial court reasoned that unless Conkling could show a scheme to defraud stemming from the 1963 agreement,[2] he could not prove the minimum two predicate acts to support a RICO claim.

We note at the outset that RICO cases appear to be specially suited for trial limitation. In fact, numerous trial courts have ordered separate trials on RICO claims to facilitate their resolution and simplify jury presentation. *See, e.g., Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* 483 U.S. 143, 145, 107 S.Ct. 2759, 2761, 97 L.Ed.2d 121 (1987) (reciting that RICO case had been severed from antitrust and tortious interference claims); *United States v. Quintanilla,* 2 F.3d 1469, 1479-80 & n. 13 (7th Cir.1993) (recognizing that trial court had ordered separate trial on RICO count and other fraud counts pertaining to an identifiable fraudulent scheme); *First Nat'l Bank and Trust Co. v. Hollingsworth,* 931 F.2d 1295, 1301 (8th Cir.1991) (noting that RICO case had been tried separately from fraudulent conveyance issues); *cf. Laitram Corp. v. Hewlett-Packard Co.,* 791 F.Supp. 113, 117-118

---

[2]As noted above, both parties agree that their agreement to share proportionate ownership in Nichols' affiliates was tied to the ownership ratio of Nichols itself. Thus, if Conkling were entitled only to 8% of Nichols, he would similarly be entitled only to 8% of the affiliates, all of which he admits having received. Conversely, if he could establish that he was defrauded out of 8.69565% of Nichols, he would have a claim to an additional .69565% ownership in each of the spin-off companies.

(E.D.La.1992) (trifurcating complex patent trial into phases to diminish potential of jury confusion). Other courts have bifurcated distinct classes of predicate acts supporting the substantive RICO claim for separate disposition. *E.g., United States v. Jenkins,* 902 F.2d 459, 461 (6th Cir.1990) (observing that district court had severed mail fraud predicate acts from substantive RICO claim and bribery and extortion predicate acts); *cf. United States v. Coonan,* 839 F.2d 886, 889-90 (2d Cir.1988) (suggesting a bifurcation procedure to be used at the charge/deliberation stage in which jury is first asked to determine which, if any, of the charged predicate acts were committed and, only if two or more are found, to consider their relatedness for purposes of a racketeering pattern).[3]

Conkling's RICO case is similarly complex. In all, Conkling has alleged during the course of this litigation at least 25 predicate acts, including the derivative claims for diminution in value of Nichols and its affiliates. Ten of these were adjudicated in the pre-trial summary judgment. The trial court apparently considered the predicate acts relating to Merit, Merit Environmental, and Gymco not to be predicate acts as a matter of law. *See* below *infra* at section II.B.3.b. The Harmony dilution claim was conceded by the parties to involve fact issues, but, as discussed above, its viability under RICO depended upon the

---

[3]Although several of these cases involve criminal, rather than civil, RICO charges, we note that bifurcation is even more remarkable in criminal trials since the Federal Rules of Criminal Procedure do not have an analogue to Federal Rule of Civil Procedure 42(b).

14

existence of at least one other predicate act. The remaining predicate acts were dependent upon a finding of fraud in the 1963 agreement[4], an issue which was tried to the jury and found against Conkling. It is clear to us that the court below had a specific purpose in paring down the issues for jury resolution to the lowest common denominator. If the 1963 agreement issue were to be resolved in the defendants' favor, the RICO case could be decided as a matter of law, thus simplifying the number of issues ultimately submitted to the jury. *See, e.g., Rossano v. Blue Plate Foods, Inc.,* 314 F.2d 174, 176 (5th Cir.) (Issue severed need not conclusively decide entire case on given claim; "[i]t is enough that there be on the record at the time a substantial issue of fact which, if determined in favor of defendant, will eliminate expense for all concerned without prejudice to the rights of the parties."), *cert. denied,* 375 U.S. 866, 84 S.Ct. 139, 11 L.Ed.2d 93 (1963); *see also In re Bendectin Litig.,* 857 F.2d at 308, 320 (recognizing the "numerous cases that have tried an individual

---

[4]Conkling's claims that he was deprived of his relative ownership—i.e., 8.69565%, rather than 8%—interests in National Maintenance, International Maintenance, TSMC, BTL, TL, Blast, Trebco, and IPS were all dependent upon a determination that he rightfully owned 8.69565% of Nichols. The jury's finding that the 1963 agreement was valid, and the inescapable conclusion that Conkling was therefore entitled only to 8% of Nichols similarly rendered the claims for an additional 8.69565% of National and International Maintenance, TSMC, BTL, and TL fatally deficient since the relative ownership in those companies was determined by Nichols ownership ratio. Conkling admitted as much in his portion of the pre-trial order. Moreover, since Blast, Trebco, and IPS were each acquired by Nichols as a wholly-owned subsidiary, the confirmation of Conkling's 8% interest in Nichols demonstrated that he had a corresponding relative ownership in each of these companies.

15

issue separately under circumstances that, had the issue been decided in favor of the plaintiff, the trial would have had more than two phases to it," and affirming district court's trifurcation order).

Under these circumstances, we cannot find that the trial court acted arbitrarily in severing the 1963 agreement predicate act. Rather, the trial transcript reflects that the court was concerned with preventing the jury from being needlessly confused by the complexity of the case, and the court's actions were in line with this interest. The court's concern about jury confusion was justified, considering that the case involved over twenty years of historical facts, a substantial number of witnesses, and countless theories of recovery. In fact, trial on the single issue (and the contract claim) took almost three and one-half weeks and involved numerous Federal Rule of Evidence 104 hearings outside the presence of the jury to determine the admissibility of evidence as to the numerous contested factual issues. Moreover, this court's long-standing rule that a district court is accorded great deference on review with respect to its severance decision reflects our perception that the trial court is in the best position to determine whether bifurcation is appropriate.

The only possible prejudice Conkling could have suffered in proceeding in this manner was his inability to aggregate the allegations of fraud with respect to his multiple claims. However, as seen above, the RICO predicate acts remaining for trial were "dormantly dependent" upon a finding of initial fraud in the 1963

16

agreement, and Conkling "would have been not one whit more entitled to a verdict [in the RICO case] merely because lengthy additional testimony might have been taken on the separate and irrelevant issues" relating to the dependent claims. *Rossano,* 314 F.2d at 176-77. The real injury to Conkling, as is evident in his argument to this court, was not the bifurcation of trial, but the trial court's subsequent resolution of the entire RICO case based upon the jury finding as to the one predicate act, a point which we will address below.

Finally, and although Conkling complains that he was not given any notice of the dramatic severance until the weekend before trial, we note that he would have been in no different a position if the trial court had granted summary judgment on the RICO predicate acts severed.[5] The dependence of the spin-off predicate acts upon the 1963 agreement was fully briefed by the defendants in their motion for summary judgment, and, had the trial court found no fact issue with respect to that agreement, it would have necessarily dismissed these claims as well. Indeed, Conkling's own "Statement of Plaintiffs' Claims" in the pre-trial order acknowledged the dependence:

> [The ownership relationship agreement between Conkling and Turner] was established on the basis of Turner owning 85 shares of Nichols and Conkling owning 10 shares.... This ownership relationship was what Turner and Conkling agreed would always determine their relative ownership in all

---

[5]In this regard, we observe that a district court may sever a case on its own motion. *FDIC v. Selaiden Builders, Inc.,* 973 F.2d 1249, 1253 (5th Cir.1992). Thus, the fact that no formal request was made by either of the parties is not fatal to the decision to stage separate trials.

17

> subsequently formed entities.... Each time Turner formed a new entity, ... Mr. Conkling was entitled to acquire his proportionate ownership relative to Turner's. Turner later formed National Maintenance, International Maintenance, Harmony, TSMC, BTL, and TL. Each time one of these entities was formed, Turner tacitly reaffirmed ... the ownership relationship agreement with Conkling.... *Because Turner had reduced Mr. Conkling's ownership interest in Nichols through the 1963 fraud, Conkling received less of an interest in those entities than that to which he was entitled.*

(emphasis added). Accordingly, once the jury decided that there was no fraud in the 1963 agreement, the vitality of these pendent claims then became a matter of law, thereby eliminating a large portion of the litigation. We hold that the district court did not abuse its discretion in staging the trial in this way.

B. The RICO Summary Judgments

Conkling next challenges the district court's grant of summary judgment on his "agreement to repurchase" predicate act prior to trial and on his entire RICO case after the jury's verdict concluded the first phase of the bifurcated trial. With respect to the pre-trial summary judgment, the trial court did not elaborate upon the grounds for its decision. The trial court recited in its post-trial summary judgment that the jury's finding "that the defendants were not guilty of any fraud" decided the remainder of the RICO case as a matter of law. We note the standard of review and address each contention in turn.

1. Standard of review

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as

18

a matter of law." FED.R.CIV.P. 56(c). Once a properly supported motion for summary judgment is presented, the burden shifts to the non-moving party who bears the burden of proof at trial to show with "significant probative" evidence that there exists a triable issue of fact. *In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir.1982). We review a summary judgment *de novo*, applying the same criteria employed by the district court in the first instance. *Federal Deposit Ins. Corp. v. Dawson*, 4 F.3d 1303, 1306 (5th Cir.1993); *Fraire v. City of Arlington*, 957 F.2d 1268, 1273 (5th Cir.), *cert. denied*, --- U.S. ----, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992). Conkling implies that the district court improperly reversed itself, having originally denied summary judgment on certain issues, then later granting judgment on these same issues pursuant to its *sua sponte* reconsideration after trial. However, this court has held that a trial court may reconsider a previously denied motion for summary judgment even in the absence of new evidentiary material. *Enlow v. Tishomingo County, Miss.*, 962 F.2d 501, 507 n. 16 (5th Cir.1992).

2. The agreement to redeem

As one of the predicate acts in support of his RICO counts, Conkling asserts that Turner entered into an agreement with him over twenty years ago to purchase Conkling's stock at a "fair price" in the event of termination while harboring a secret intention never to perform that agreement. He argues that the district court erroneously granted a pre-trial summary judgment on this claim when fact issues abounded.

19

A contract to purchase and sell securities in the future can constitute a "purchase or sale" of the securities actionable under the federal securities laws. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750-51, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975). However, Conkling did not assert an independent securities fraud claim. Rather, he has used the alleged violations as predicate acts under RICO. The defendants argue that Conkling has not claimed damages as a result of this fraud claim, but instead has requested specific performance of the agreement[6], a remedy which is not available to private litigants under RICO. The district court apparently adopted this argument in deciding the issue since it originally denied summary judgment with respect to Conkling's breach of contract claim based upon the same allegations as was this fraud claim and against which the defendants raised virtually the same defenses save this one.

This court has not yet decided whether RICO affords private litigants the option of equitable remedies,[7] and our sister

---

[6]In the trial court, the defendants pointed out that the "damages" Conkling seeks are actually the book value of the stock he currently owns and that Conkling himself has acknowledged that he must relinquish all of the stock if he is awarded damages on this claim.

[7]In *In re Fredeman Litig.,* we held that RICO did not authorize a private party to seek an injunction freezing a defendant's assets to secure a potential judgment since that remedy was not available outside of RICO, and we were unwilling to extend injunctive relief solely under RICO where the legislative intent did not appear to permit it. 843 F.2d 821, 830 (5th Cir.1988). We specifically reserved ruling on "whether all forms of injunctive relief and other equitable relief are foreclosed to private plaintiffs under RICO." *Id.*

20

circuits appear to disagree on the issue.[8]  However, we need not resolve this dispute today since the district court's subsequent grant of judgment as a matter of law on Conkling's corollary breach of contract claim, *see infra* section II.D—finding that Conkling failed to adduce sufficient evidence that there was a contract—confirmed that summary disposition of this securities fraud claim was proper.[9]  The premise of this fraud claim is that Turner entered into an "oral agreement to purchase Conkling's stock at the end of Conkling's employment."  It was therefore critical that Conkling establish an oral contract to "purchase" or "sell" to sustain a fraud claim under federal securities laws.  *See Blue Chip*

---

[8]*Contrast Religious Tech. Ctr. v. Wollersheim,* 796 F.2d 1076, 1088-89 (9th Cir.1986) (expressly holding that injunctive relief was not available under RICO), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987) *and Dan River, Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir.1983) (noting "substantial doubt about whether RICO grants private parties ... a cause of action for equitable relief") *and Miller v. Affiliated Fin. Corp.,* 600 F.Supp. 987, 994 (N.D.Ill.1984) (RICO does not permit equitable remedies such as declaratory judgment and recision.) *with Bennett v. Berg,* 685 F.2d 1053, 1064 (8th Cir.1982) (implying that equitable relief may be available under RICO), *aff'd on reh'g,* 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983) *and Aetna Cas. & Sur. Co. v. Liebowitz,* 570 F.Supp. 908, 910-11 (E.D.N.Y.1983) (reasoning that Congress did not intend "to deprive the district court of its traditional equitable jurisdiction" to grant injunctive relief for alleged violations of RICO statute), *aff'd on other grounds,* 730 F.2d 905 (2d Cir.1984).

[9]This court may affirm a grant of summary judgment on any appropriate ground that was raised to the district court and upon which both parties had the opportunity to introduce evidence. *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1081, --- L.Ed.2d ---- (1994); *Chevron U.S.A., Inc. v. Traillour Oil Co.,* 987 F.2d 1138, 1146 (5th Cir.1993);  *Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1355 n. 3 (5th Cir.1986).

*Stamps,* 421 U.S. at 751, 95 S.Ct. at 1932 (observing that "[u]nlike respondent, which had no contractual right or duty to purchase Blue Chip's securities, the holders of puts, calls, options, and other *contractual* rights or duties to purchase or sell securities have been recognized as "purchasers' or "sellers' for purposes of Rule 10b-5.") (emphasis added). His failure to do so was fatal to this predicate act as a matter of law.

3. The case tried and resulting post-trial RICO summary judgment

The district court specifically held that Conkling's "claim under RICO should be dismissed since the jury found no fraud on the part of the defendants in this case." Implicit in this finding is a conclusion that all but one[10] of the remaining predicate acts were dependent upon fraud in the 1963 agreement. The trial court had already dismissed before trial many of the predicate acts enumerated in Conkling's brief as either (i) derivative claims, which Conkling did not have standing to bring, or (ii) actions that could not be RICO predicate acts as a matter of law. The court then apparently determined that the predicate acts remaining for

---

[10]As noted above, the parties agreed that there were fact issues as to whether the Harmony securities transaction could constitute a predicate act, thus precluding summary disposition of that claim, but standing alone, it could not constitute a RICO "pattern." 18 U.S.C. § 1961(5); *see also H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 237-38, 109 S.Ct. 2893, 2899-2900, 106 L.Ed.2d 195 (1989) ("The statement that a pattern "requires at least' two predicate acts implies "that while two acts are necessary, they may not be sufficient.' ") (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985)); *McLaughlin v. Anderson,* 962 F.2d 187, 192 (2d Cir.1992) (holding that the failure to establish at least two predicate acts is fatal to RICO claim).

22

jury resolution stemmed from the 1963 agreement[11] and adjudicated all of them as a matter of law when the jury failed to find fraud in the execution of that agreement. Conkling argues that not all of his predicate acts can be neatly pigeonholed into one of the three enumerated categories. Specifically, he challenges the district court's resolution of the Harmony, Merit, TIL, IPS, Blast, and Trebco transactions. In his reply brief, Conkling belatedly asserts that the use of an improper depreciation measure unfairly deflated the book values of the companies in which he retained an interest. We discuss each of these claims below.

### a. Harmony

Although, as noted previously, the defendants concede a fact issue with respect to the Harmony dilution claim, that transaction standing alone could not support a RICO "pattern"—necessitating *at least two* acts of racketeering activity—under section 1961 of Title 18. 18 U.S.C. § 1961; *see also McLaughlin,* 962 F.2d at 194 (affirming dismissal of section 1962(c) & (d) claims because plaintiff failed to allege that "any defendant committed more than a single act of racketeering").

### b. Merit, Merit Environmental and Gymco

The Merit Environmental and Gymco claims appear to be integrally related to the Merit transaction. However, neither of these transactions suffices to defeat summary judgment on the RICO case. Since Merit Environmental was a corporation wholly owned by Merit, Conkling could have no claim that he was defrauded out of

---

[11]*See supra* note 4.

any proportionate ownership in Merit Environmental unless he could prove fraud with respect to Merit. Further, although Conkling argues in a conclusory manner that he "was defrauded out of his relative ownership in Merit [ ], Merit Environmental, and Gymco pursuant to his ownership relationship agreement with Turner," he does not articulate in his brief any basis for asserting the predicate act of mail fraud with respect to Gymco. In fact, the only evidence proffered by Conkling to defeat summary judgment on the Gymco "predicate act" is evidence showing a fact issue with respect to Turner's ownership of the partnership. Conspicuously absent from Conkling's argument is any analysis of, or even reference to, summary judgment evidence tending to prove a mail fraud in connection with Gymco.[12] In short, we have serious doubt that the Gymco transaction was ever more than an attempt to put before the jury evidence of Turner's "other crimes" under Federal Rule of Evidence 404(b). Regardless of whether the district court treated the Gymco facts as merely Rule 404(b) evidence or as an attempted predicate act of mail fraud, it properly disposed of the claim in summary judgment.

The claims relating to Merit are more difficult. Conkling asserts in this court as below that he was "fraudulently deprived by Turner of his rightful proportionate interest in Merit." This transaction was clearly not derivative, nor was it a direct result

_____

[12]Indeed, none of the "183 items transmitted through the U.S. mail to [Conkling] in furtherance of defendants' scheme to defraud," or the numerous mailings to the Louisiana Secretary of State referred to by Conkling in his brief even relates to Gymco.

24

of the 1963 agreement.  However, we do not believe it was a viable

predicate act by the time of trial.  The defendants pointed out

that Conkling waived any claim for damages from Merit, concluding

that he could introduce the evidence under Federal Rule of Evidence

404(b) as "evidence of other crimes, wrongs, or acts," which are

only admissible for limited purposes, "such as proof of motive,

opportunity, [or] intent...." FED.R.EVID. 404(b).  Conkling admits

that he waived any damage claim with respect to Merit but contends

that he did not waive the predicate act itself.  He argues that it

is not necessary to demonstrate injury flowing from each predicate

act, but only from some in order to show a pattern of racketeering

activity.  *See, e.g., Deppe v. Tripp,* 863 F.2d 1356, 1366-67 (7th

Cir.1988);  *Town of Kearny v. Hudson Meadows Urban Renewal Corp.,*

829 F.2d 1263, 1268 (3d Cir.1987);  *Marshall & Ilsley Trust Co. v.

Pate,* 819 F.2d 806, 809 (7th Cir.1987);  *Panna v. Firstrust Sav.

Bank,* 760 F.Supp. 432, 437 n. 6 (D.N.J.1991).  Although the record

is somewhat ambiguous on this point, it appears to us that Conkling

waived the entire predicate act.[13]  During trial, Conkling's counsel

admitted that he had previously agreed to abandon the damage claim

on Merit because he understood the district court to have ruled

---

[13]We asked the parties for additional briefing on whether
Conkling had waived the Merit claims as predicate acts since the
defendants had so intimated in their brief.  The transcript shows
that Conkling waived the Merit claim, assuming that he could
admit the evidence under Rule 404(b), and reveals a series of
conflicting positions taken by Conkling on this issue.  Although,
as acknowledged above, the sequence of events is less than
clear—due largely to the fact that several critical, pre-trial
conferences on this issue were unrecorded—our best reading of the
record leads us to conclude that Conkling abandoned Merit as a
predicate act.

that the evidence could be admitted under Rule 404(b) at a prior status conference. The district court apparently considered the transaction as being at best "other crimes" evidence as reflected in the following exchange:

> MR. BECKER [Conkling's counsel]: .... Do you remember, we talked about it. I agreed to give up the damage claim on Merit because you said it was admissible under 404(b) at the status conference.

> THE COURT: I didn't say that it was totally admissible.... [Merit] could not even be a damage claim because it wasn't prayed for, number one. Number two, what I said was—what I said was the fact that it is not a damage claim doesn't mean that it can[not] be used for another purpose including 404(b), but I never made a ruling that it was absolutely admissible under 404(b) at that time.

It is entirely inconsistent for Conkling to claim that the Merit evidence is admissible under Rule 404(b) and yet to argue that it constitutes a predicate act. A predicate act, by its very nature, is evidence directly bearing on an issue in the case which would not need to be screened through Rule 404(b).

Important in this regard is the fact that several documents of record reflect that the status conference referred to by Conkling's counsel in the above-cited dialogue took place prior to the district court's severance of the RICO claim. Accordingly, Conkling's voluntary waiver of the Merit transaction as a claim under the belief that the evidence would be admitted under Rule 404(b) could not have been simply a response to the trial court's ruling that only one predicate act would be tried.

### c. TIL

Conkling also claims that the TIL predicate acts should not have been decided on summary judgment. Conkling admits that TIL

26

is, and always has been owned by Turner and his family. In fact, based upon Turner's representations that "TIL would *solely* be an *estate planning tool* to enable Turner to hold all of his and his family's stock in Nichols and Harmony, ... Conkling agreed that he would not be entitled to acquire his relative ownership in TIL." Although it is undisputed that the ownership of TIL remains exclusively in Turner and his family, Conkling claims that the placement of TIL as chief operating company over Nichols and its affiliates somehow changed its nature and entitled him to ownership. A closer look at the allegations and evidence, however, shows that Conkling's damages are based upon TIL's profits from the management of the Nichols-related companies, which is a derivative claim. Since Conkling does not have standing to raise derivative claims on behalf of the companies in which he holds stock, *see Adams-Lundy v. Association of Professional Flight Attendants,* 844 F.2d 245, 250 (5th Cir.1988), the district court properly granted judgment on this claim in favor of the defendants.

### d. IPS, Blast, and Trebco

IPS, Blast, and Trebco were each acquired by Nichols as a wholly-owned subsidiary, and the jury's confirmation of Conkling's 87 interest in Nichols demonstrated that he retained relative ownership in each of these companies. Therefore, these claims were properly resolved in the post-trial summary judgment as "dormantly dependent" upon a determination of fraud in the 1963 agreement.

### e. Depreciation

Although Conkling's reply brief makes reference to the

27

improper depreciation claim numbered as predicate act 17, we do not "consider arguments belatedly raised after appellees have filed their brief" in the absence of manifest injustice. *Najarro v. First Fed. Sav. & Loan Ass'n,* 918 F.2d 513, 516 (5th Cir.1990); *see also Smith v. Lucas,* 9 F.3d 359, 367 n. 16 (5th Cir.1993). It appears to us that Conkling waited to raise this argument until his reply brief in order to evade the fifty-page limit set forth in Federal Rule of Appellate Procedure 28(g), and thus it is not "manifestly unjust" for this court to refuse to address it. *See, e.g., Neeley v. Banker's Trust Co.,* 757 F.2d 621, 634 n. 18 (5th Cir.1985) (noting that the appellant's brief exceeded the 50-page limit and "warn[ing] counsel that violations may result in the Court's striking of their briefs *sua sponte* ").

### f. In conclusion, ...

The trial court correctly perceived that the predicate acts remaining for jury resolution—with the exception of Harmony—were contingent as a matter of law upon a finding of fraud in the 1963 agreement. Accordingly, we hold that the trial court did not err in granting summary judgment to the defendants on the RICO case.

## C. Breach of Fiduciary Duty

The district court determined "that there is no factual or legal basis to support [Conkling's] breach of fiduciary claim." Accordingly, it granted summary judgment on Conkling's breach of fiduciary duty claim. Although Conkling's brief on this issue is almost entirely conclusory, inappropriately incorporating briefing

filed below,[14] he has arguably raised the claim on appeal, and we will employ our best efforts to review the grant of summary judgment on this claim as applied to each factual circumstance.

Turner contends that the fiduciary duty claims are based upon the same facts already found to be fatally deficient as causes of action as discussed both *supra* and *infra.* However, after careful review of the record on appeal, we have not found that Turner moved for summary judgment on all of the breach of fiduciary duty issues.[15] Specifically, Turner did not move for summary judgment

---

[14]Attorneys cannot circumvent the fifty-page limit of Federal Rule of Appellate Procedure 28(g) by incorporating by reference a trial memorandum. *Walters v. First Tenn. Bank, N.A.,* 855 F.2d 267, 275-76 n. 5 (6th Cir.1988), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1344, 103 L.Ed.2d 812 (1989); *see also Katz v. King,* 627 F.2d 568, 575 (1st Cir.1980) ("If counsel desires our consideration of a particular argument, the argument must appear within the four corners of the brief filed in this court."). *Cf. Neeley v. Banker's Trust Co.,* 757 F.2d 621, 634 n. 18 (5th Cir.1985) (noting that the appellant's brief exceeded the 50-page limit and "warn[ing] counsel that violations may result in the Court's striking of their briefs *sua sponte.*").

[15]Many of the fiduciary duty claims were raised on summary judgment below. For example, Turner argued in his summary judgment papers that Conkling did not have standing to bring any of the asserted derivative claims as a matter of law, a position adopted by the district court. Moreover, and as discussed above, Conkling waived any damage claim with respect to the Merit transactions, and we interpret this waiver to include damages for breach of fiduciary duty. There is also an indication in Conkling's Supplemental Memorandum in Opposition to Defendants' Motions for Summary Judgment filed on December 11, 1991, that the court below *sua sponte* raised the issue of whether its decision in *Nichols Constr. Corp. v. St. Clair,* 708 F.Supp. 768 (M.D.La.1989), *aff'd mem.,* 898 F.2d 150 (5th Cir.1990), was "applicable to the pendent breach of fiduciary duty claim asserted in this case by" Conkling. The *Nichols* case addressed St. Clair's similar allegations about an agreement to redeem, which the trial court rejected. Thus, these fiduciary duty claims appear to have been addressed and resolved in the summary judgment framework.

29

in the court below on the basis that the Harmony dilution claims pled as a breach of fiduciary duty could be summarily adjudicated; rather, he argued only that Conkling did not have standing to assert Harmony claims derivatively.[16]  In fact, Turner has conceded on appeal that a fact issue exists with respect to the Harmony dilution transaction.  Although that claim, as noted above, was properly adjudicated in the RICO context on the basis that it was the only predicate act available to Conkling, we conclude that the conceded fact issue preserves it in the fiduciary duty context.

Similarly, Turner did not request summary disposition of the fiduciary duty claims relating to the 1963 agreement and its progeny.  The summary judgment arguments and the jury issue went to whether any of the actions or omissions stemming from that agreement were fraudulent—not whether they constituted a breach of any fiduciary duty.  With respect to these claims, therefore, Turner could not have met his initial summary judgment burden of pointing out an absence of any fact issues by identifying portions of the pleadings, discovery, and affidavits which support its position.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  Thus, the trial court's grant of summary judgment on these fiduciary duty issues was in error.

---

[16]As noted above, the Harmony transaction, like many of the others, involved both derivative claims and individual claims between which the district court distinguished in granting and clarifying summary judgment.  The clarification order explains that the trial court specifically disposed of the Harmony derivative claims, but retained the dilution claims.

D. Rule 50(a) Adjudication of Conkling's Breach of Contract Claim

The district court granted judgment as a matter of law on this claim after the close of Conkling's case, and we review its decision *de novo,* applying the same legal standard as it used. *Omnitech Int'l, Inc. v. The Clorox Co.,* 11 F.3d 1316, 1322-23 (5th Cir.1994). Judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." FED.R.CIV.P. 50(a). In evaluating such a motion, formerly referred to as a motion for directed verdict, the court is to view the entire trial record in the light most favorable to the non-movant, drawing all factual inferences in favor of Conkling, the non-moving party, and leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *see also Becker v. PaineWebber, Inc.,* 962 F.2d 524, 526 (5th Cir.1992). The "decision to grant a directed verdict ... is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury." *In re Letterman Bros. Energy Sec. Litig.,* 799 F.2d 967, 972 (5th Cir.1986) (citing *Lubbock Feedlots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 269 n. 22 (5th Cir.1980)), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

Article 2439 of the Louisiana Civil Code requires three

31

circumstances to concur to confect a contract: the thing sold, the price, and mutual consent. LA.CIV.CODE ANN. art. 2439 (West 1952). Article 2464 requires that the price of the sale be "certain," or, as the provision further defines it, "fixed and determined by the parties." LA.CIV.CODE ANN. art. 2464 (West 1952). To sustain a cause of action for breach of an oral agreement for value in excess of $500, a party must prove its existence by at least one witness and corroborating circumstances. LA.CIV.CODE ANN. art. 1846 (West 1987); *see also Dupuy v. Riley,* 557 So.2d 703, 707-08 (La.Ct.App.) (recognizing that oral contract for transfer of securities may be proven under article 1846 by one credible witness and proof of corroborating circumstances), *writ denied,* 563 So.2d 878 (La.1990).[17] After a lengthy trial on this issue and the 1963 agreement, the trial court found that, as a matter of Louisiana law, no oral agreement existed whereby Turner agreed to purchase Conkling's stock for "fair value" upon termination of Conkling's employment with Nichols.[18] The court first concluded that the

_____

[17]In 1978, the Louisiana Legislature enacted a statute of frauds for securities transactions, requiring that such contracts be put into writing, *see* LA.REV.STAT.ANN. § 10:8-319 (West 1993), and thus *Dupuy v. Riley,* 557 So.2d 703, 707-08 (La.Ct.App.), *writ denied,* 563 So.2d 878 (La.1990), which was predicated entirely on a pre-1978 decision, has been called into question on this point. *See Levinson v. Charbonnet,* 977 F.2d 930, 932 (5th Cir.1992). However, since the alleged contract between Turner and Conkling was entered into prior to 1963, the recent statute has no application in this case.

[18]The trial transcript reflects that Conkling's counsel conceded that Conkling had no agreement to redeem his stock with any of the defendant corporations. Accordingly, the trial court summarily dismissed that claim as abandoned. His allegations were therefore limited to an oral agreement with Turner that Turner would repurchase Conkling's stock.

evidence was legally insufficient to support the existence of an agreement to repurchase. Essentially, the only person to testify that the agreement was confected was Conkling, who admitted that he could not remember any of the terms of the agreement or any statements made by Turner. Although the Louisiana Supreme Court has made clear that a "plaintiff may, himself, fulfill the requirement for at least one credible witness," *Samuels v. Firestone Tire & Rubber Co.,* 342 So.2d 661, 662 (La.1977), the court below did not consider Conkling's testimony to be sufficiently specific to verify the existence of an oral contract, concluding that, at best, the evidence showed that Conkling had an "understanding" of Turner's obligation.

The court below further found that, even if it construed Conkling's "understanding" as a binding agreement, there was no evidence to corroborate the oral agreement. Conkling responded, as he does before this court, that Louisiana law does not require that a plaintiff provide "independent proof of every detail of [his] testimony." *Samuels,* 342 So.2d at 662; *see also Taylor v. Dowden,* 563 So.2d 1294, 1297 (La.Ct.App.) ("[O]nly general corroboration must be shown."), *writ denied,* 568 So.2d 1057 (La.1990). He argued that (i) Turner's admission that he "told Mr. Conkling that when Conkling left the company his stock would be redeemed at a "fair price,' " (ii) Turner's handwritten notes referencing a potential purchase of Conkling's "equity" in the event of termination, and (iii) inferences he drew from certain patterns of events, were sufficient to corroborate generally his testimony that an agreement

33

was reached.

The trial court nonetheless determined that any oral contract failed for lack of a definite price, a term which must be fixed and determined in order to create a binding contract of sale under Louisiana law. LA.CIV.CODE ANN. art. 2464 ("The price of sale must be certain, that is to say, fixed and determined by the parties."); *see also Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 642 F.Supp. 781, 801 (E.D.La.1986) (A "price term [is] "essential to the contract of sale,' and a failure to agree to such a term would amount to a failure to establish a sales contract at all."). The court below observed that there was nothing in the record to show that the parties had a meeting of the minds as to how to compute "fair value" and rejected Conkling's argument that "fair value" was a sufficiently certain price under Louisiana law. We agree. Although parties to a contract need not agree to a specific price, they must agree to some ascertainable method to arrive at that price in order to have a binding contract of sale under Louisiana law. LA.CIV.CODE ANN. arts. 2464 & 2565; *Compare Directional Wireline Servs., Inc. v. Tillett,* 552 So.2d 1201, 1214 (La.Ct.App.1989) (Even though parties' agreement provided that "book value" would be used to compute stock redemption price, dispute over proper procedure to calculate "book value" showed that there was no "meeting of the minds" as to a definite price term and defeated contract as a matter of law) *with Hearty Burger of Harvey, Inc. v. Brown,* 407 So.2d 806, 808 (La.Ct.App.1981) (holding that evidence supported trial court's conclusion that defendant knew

exact amount of principal obligation to be assumed, and defendant could not complain that disagreement over the amount of interest outstanding rendered the contract to assume plaintiff's obligation fatally defective for lack of definite price; however, contested interest would not be included in amount of sale). "[I]f the parties have bound themselves in such a way that price may be later determined as a consequence of their consent without any new act of volition on their part, then the price is certain and the sale is valid." *Shell Oil Co. v. Texas Gas Transmission Corp.,* 210 So.2d 554, 560 (La.Ct.App.), *writ denied,* 252 La. 247 & 250, 214 So.2d 165 & 166 (1968).

Conkling cites to the Louisiana Supreme Court's opinion in *Benglis Sash & Door Co. v. Leonards,* 387 So.2d 1171, 1172-73 (La.1980), for the proposition that "the parties can consent to buy and sell a certain thing for a reasonable price, and when they do, the contract for sale has been perfected. The essential thing is that there is a meeting of the minds (as opposed to a disagreement) as to price." In our view, the trial court properly confined the holding in *Benglis* to its specific fact-setting. The parties in *Benglis* had a prior course of dealings and a sufficiently mutual understanding of price terms based upon this relationship, as evidenced by the fact that the defendant did not object to the price ultimately charged. *Id.* at 1173. *Benglis* did not eliminate—but rather reemphasized—the necessity of showing that the parties reached a meeting of the minds as to that term. In fact, the cases decided after *Benglis* have not read it, as would Conkling

in this case, as a wholesale revision of the definite price requirement of article 2464, but rather, as limited to its facts, and have continued to require evidence of an objectively ascertainable price. *See Hunt v. Gulftrust Fund No. Fifteen, Inc.,* 606 So.2d 25, 27 (La.Ct.App.1992) (Because parties to real estate sale disagreed as to who would be responsible for mortgage payments after sale, the conflicting testimony established that there had been no meeting of the minds as to a definite price term.); *Sherman v. State Farm Mut. Auto. Ins. Co.,* 413 So.2d 644, 648-49 (La.Ct.App.) (distinguishing *Benglis* on grounds that the parties in case presented had insufficient knowledge of amount of mortgage to be assumed, and thus, price was not ascertainable "by computation of definite facts"), *writ denied,* 414 So.2d 776 (La.1982); *see also Rutgers, State Univ. v. Martin Woodlands Gas Co.,* 974 F.2d 659, 662 (5th Cir.1992) (applying *Shell Oil* certainty test and holding that contract which provided that parties would renegotiate price terms each year and set a limit upon prospective increases in price only with no corresponding floor lapsed after the end of the first year for lack of a definite agreement as to future price); *cf. Anderson v. Namias,* 477 So.2d 907, 909-10 (La.Ct.App.1985) (Evidence clearly showed that defendant understood his deposit constituted one-half of the sales price and confirmed that the parties had agreed to a certain price.).

*Wegman v. Central Transmission, Inc.,* 499 So.2d 436 (La.Ct.App.1986), *writ denied,* 503 So.2d 478 (La.1987), does not alter our analysis. Conkling reads *Wegman* to uphold as definite

36

the use of the price term "equitable price," as amounting to a "fair price" to which the plaintiff was found to be contractually entitled. Conkling misreads *Wegman.* In that case, the parties had several agreements relating to gas production and sale. Under the "gas purchase agreement," the defendant was to buy gas from the plaintiff, Wegman, for a certain price. A supplemental agreement further provided that the parties would negotiate and come to an "equitable agreement" as to price if a designated third party did not purchase the gas from the defendant. The defendant—who sold gas to parties other than the one designated in the parties' agreement—argued that reading the two agreements together would yield an unenforceable agreement for lack of a certain price. The Louisiana court of appeals summarily rejected that argument, holding that the two contracts could be read together without eliminating the definite price term in the first. Alternatively, it concluded that Wegman could recover a "fair price" for gas which had been appropriated from his leased interests but improperly credited to the production of other wells. *Id.* at 447 ("[W]hether the contract specifies a price or not, Wegman is entitled to be paid for his gas. The court must determine the fair market value of Wegman's gas and award him that amount."). Although the court of appeals cited to article 1995 of the Louisiana Civil Code,[19] the provision governing damages for breach of an obligation, its analysis is in quantum meruit—i.e., that Wegman was entitled to

---

[19]*See* LA.CIV.CODE ANN. art. 1995 ("Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived.").

payment for gas previously acquired by the defendant. *Id.* Thus, we do not interpret *Wegman* as permitting an "equitable" price to be sufficiently definite to support a contract.

Moreover, in fact-settings more akin to that presented, the Louisiana courts have found such terms as "book value," "market rise," and "prevailing price" not to be sufficiently ascertainable and thus fatal to the confection of a contract. *See, e.g., Directional Wireline,* 552 So.2d at 1214 (holding that parties' failure to agree as to the method used to calculate "book value" of stock to be purchased precluded meeting of the minds as to essential element of price); *Princeville Canning Co. v. Hamilton,* 159 So.2d 14, 17, 18-19 (La.Ct.App.1963) (Contract providing that sale prices will increase according to "market rise" does not provide an objective method by which the price of the sale can be established with certainty when there is no agreement as to a method by which "market rise" can be determined.); *Shell Oil,* 210 So.2d at 558 (rejecting "prevailing price" as being too indefinite without reference to a specific market from which it can be readily discerned).

Similarly, no "agreed" price for Turner to redeem Conkling's stock can be determined with any certainty because there is no discernible agreement as to any method by which "fair value" could be computed. Conkling suggests that the Nichols' board minutes reflecting Turner's request for permission to negotiate a redemption price based upon the underlying assets of the corporation and his statement that he "might have to redeem" the

stock of the minority shareholders is conclusive proof that the parties had previously agreed to a definite method to calculate fair value. Conkling understands these portions of the minutes as "mean[ing] that Turner was authorized to negotiate a price based upon the value of the underlying assets of the companies, and if they could not agree on a value for the underlying assets, then an independent appraisal would be used." He offers the original agreements between Nichols and its shareholders (including Turner and Conkling) in 1962 and 1963—which included independent appraisal clauses and certain guidelines for calculating redemption values—as providing the method by which he and Turner would compute the "fair value" of the stock. There are several problems inherent in looking to the 1962 and 1963 agreements for guidance. First, the two agreements have conflicting provisions regarding valuation.[20] Moreover, the 1962 agreement was superseded by the 1963 agreement, and, in 1966, the parties expressly voided that redemption formula as well. Finally, and most importantly, Conkling did not testify that he and Turner agreed to use any formulas set forth in these agreements, but rather that he *believed* that fair value would be calculated in his agreement with Turner as it was in the Nichols agreements. His beliefs in this regard are merely speculation and do not evidence that the parties reached a consensus as to a method by which "fair value" could be calculated. Thus, Conkling's

---

[20]For example, in the 1962 agreement, the redemption price would be calculated by a specific formula if the appraisers determined the per share value of the stock to exceed $1,000. There is no such provision in the 1963 agreement.

argument that these agreements offer instruction for agreed redemption values is strained. In sum, we find that, in the case presented, "fair value" is "not capable of being ascertained by computation of definite facts; it can not be deemed certain in the present case." *Sherman,* 413 So.2d at 648. Accordingly, we affirm the district court's elimination of this claim from the jury's consideration.

E. Subsequent Oral Modification Evidence

Conkling next takes issue with the trial court's instruction to the jury to disregard evidence of an alleged subsequent oral agreement modifying the 1962 agreement. Conkling testified at trial that, after the written agreement was executed in 1962, Turner modified the agreement by giving him a stock certificate and informing him that the stock was in exchange for previous services. However, the district court interrupted his testimony in this regard and instructed the jury to disregard any agreements "except for the 1962 agreement and the 1963 agreement.... The witness can testify what happened post [19]63 but not pre [19]63 regarding other agreements between the parties." Conkling argues that the subsequent oral modification of the 1962 agreement should have been admitted and directs our attention to Article 1848 of the Louisiana Civil Code, providing that:

> Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that *evidence may be admitted* to prove such circumstances as a vice of consent, or a simulation, or *to prove that the written act was modified by a subsequent and valid oral agreement.*

LA.CIV.CODE ANN. art. 1848 (West 1987) (emphasis added).

40

Conkling's argument that the oral agreement modified the earlier, 1962 agreement misses the mark. The focus of this case is upon the written, 1963 agreement. Under Conkling's own version of the facts, this alleged oral agreement was entered into *before* the 1963 agreement. The pertinent provision of Article 1848 limits consideration of such evidence to "*subsequent* and valid oral agreement[s]" in particular situations, in which "the interest of justice" will be best served by introducing the testimony. Similarly, the cases are legion that parol evidence may not be admitted to vary the terms of a written contract except in the above-enumerated circumstances. *Billingsley v. Bach Energy Corp.,* 588 So.2d 786, 791 (La.Ct.App.1991); *Bank of Coushatta v. Patrick,* 503 So.2d 1061, 1065-66 (La.Ct.App.), *writ denied,* 506 So.2d 1231 (La.1987); *Texaco, Inc. v. Newton and Rosa Smith Charitable Trust,* 471 So.2d 877, 881-82 (La.Ct.App.), *writ denied,* 475 So.2d 1104 (La.1985). The facts presented do not warrant such consideration.

Moreover, the 1963 agreement—voluntarily executed by Conkling—provided that it was "the sole agreement *by and between the parties* in connection with the purchase or sale of any and all interests in and to Nichols Construction Corporation, *being substituted* for *any previous agreement or understanding, oral* or otherwise" (emphasis added). The agreement was signed by both Turner and Conkling as "parties." The entire purpose of the 1963 agreement was to provide a mechanism whereby Conkling could acquire stock in Nichols. The plain terms of the 1963 agreement allocated

41

8% of the stock outstanding to Conkling.[21]  Pursuant to the 1963 agreement, the minority shareholders, including Conkling, were to pay $100 for their stock, and the undisputed facts show that they paid the amount and received the certificate.  Under the facts presented, the inclusion of the merger clause leads us to conclude that the clause correctly reflected the parties' intentions and consequently precludes evidence of any alleged prior agreement. *Omnitech,* 11 F.3d at 1328 (holding that a merger clause "correctly reflect[ing] the parties' intentions ... should thus be enforced as written.");  *Johnson v. Orkin Exterminating Co.,* 746 F.Supp. 627, 633 (E.D.La.1990) (same).  First, we note that, during the period between the two agreements, several circumstances had changed considerably the ownership distribution of Nichols' stock—most notably, the redemption of Eaton's stock.  It appears to this court that the whole purpose in entering into the 1963 agreement was to confirm relative ownership and that, had Conkling believed the document did not accurately reflect the distribution, he would have objected at that point.  It is completely inconsistent for Conkling to harbor a secret belief that he was entitled to a larger percentage and yet to execute a document that unequivocally set

---

[21]As noted *supra* at section I.A, the ownership interests in Nichols were apportioned as follows:

| | |
|---|---|
| Bert S. Turner | 76 per cent |
| Carmen L. St. Clair | 8 per cent |
| Richard L. Conkling | 8 per cent |
| J.B. Millican | 8 per cent |

42

forth his ownership rights in such explicit terms. Moreover, Conkling was able to introduce evidence that he executed the 1963 agreement under fraudulent circumstances, and the jury rejected that argument in resolving the issue against him. Finally, Conkling's own testimony revealed that he (i) received 8% of Nichols' stock in accordance with the 1963 agreement, (ii) reaffirmed his ownership interest as being 8%, rather than 8.69565%, in numerous documents, including tax returns and sub-chapter S conversion documents, (iii) received dividends based upon an 8% interest, and (iv) acquired relative ownership in affiliated companies based upon the 8% interest, yet never breathed a word of objection to Turner. For these reasons, we hold that the trial court properly preserved the jury's focus upon the evidence relevant to the actual execution of the 1963 agreement to determine whether it was tainted by fraud and properly excluded testimony of this alleged oral agreement.

F. Claims Against Carpenter

The defendants defend the summary judgment on Conkling's causes of action relating to Carpenter in an abundance of caution, though Conkling did not address these claims in his appellant's brief. Conkling did respond to the defendants' contentions about Carpenter in his reply brief; however, as noted above, this court does not, in the absence of manifest injustice, consider claims raised for the first time after the opening briefs are filed by the appellant and appellee(s). *Najarro,* 918 F.2d at 516; *see also Smith v. Lucas,* 9 F.3d at 367 n. 16. Conkling offers, and we can

43

discern, no reason why he failed to bring up this alleged error in his initial brief.  Accordingly, we see no manifest injustice in refusing to address the issue.

### III. Conclusion

For the foregoing reasons, we reverse and remand the district court's summary adjudication of Conkling's breach of fiduciary duty claims as described above.  In all other respects, we affirm the judgment of the district court.  Each party is to bear his own costs of this appeal.

AFFIRMED in part, REVERSED and REMANDED in part.